[Cite as *State v. Vogt*, 2018-Ohio-4457.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 17CA17 |
| Plaintiff-Appellee, | : | |
| | : | |
| vs. | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| RYAN VOGT, | : | |
| | : | |
| Defendant-Appellant. | : | **Released: 10/29/18** |

_____

APPEARANCES:

Angela Wilson Miller, Jupiter, Florida, for Appellant.

Kevin Rings, Washington County Prosecuting Attorney, and Nicole Tipton Coil, Washington County Assistant Prosecuting Attorney, Marietta, Ohio, for Appellee.

_____

McFarland, J.

{¶1} Ryan Vogt appeals the judgment of the Washington County Common Pleas Court convicting him of two counts: involuntary manslaughter and trafficking in drugs.

{¶2} Upon review of the record, we find no merit to Appellant's arguments herein. Accordingly, we overrule all assignments of error and affirm the judgment of the trial court.

ASSIGNMENTS OF ERROR

I. THE EVIDENCE IS INSUFFICIENT TO SUSTAIN A CONVICTION FOR INVOLUNTARY MANSLAUGHTER. THE RESULTING CONVICTION DEPRIVED APPELLANT VOGT OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

II. APPELLANT VOGT'S CONVICTIONS FOR INVOLUNTARY MANSLAUGHTER AND DRUG TRAFFICKING ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. THIS DEPRIVED VOGT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

III. THE TRIAL COURT'S REFUSAL TO DISMISS THE CASE AGAINST VOGT VIOLATED HIS RIGHT AGAINST DOUBLE JEOPARDY AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STAES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

IV. THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY AS TO THE LESSER-INCLUDED OFFENSE OF RECKLESS HOMICIDE. ADDITIONALLY, APPELLANT VOGT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO REQUEST AN INSTRUCITON ON THE LESSER-INCLUDED OFFENSE OF RECKLESS HOMICIDE. FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS

OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 AND 16 OF THE OHIO CONSTITUTION.

FACTUAL AND PROCEDURAL BACKGROUND

{¶3} On May 31, 2016, Appellant was indicted by a Washington County Grand Jury on two counts: (1) involuntary manslaughter, R.C. 2903.04(A)&(C); and (2) trafficking in drugs, R.C. 2925.03(A)(1)&(C)(6)(a). The indictment occurred subsequent to the overdose death of Tyler Miller which occurred on January 16, 2016. Tyler Miller was a young man who had just returned to Washington County after being drug free while in rehabilitation for his heroin addiction. The indictment alleges that shortly upon Tyler Miller's return to his hometown, Appellant sold him heroin.

{¶4} Appellant proceeded to a jury trial which commenced on December 5, 2016. On the second day of trial, a discussion was held in chambers regarding: (1) text messages which had not been provided to defense counsel as part of pretrial discovery and which, the defense argued, violated Crim.R. 16; and (2) the existence of a conflict of interest which had arisen on the part of defense counsel as a result of the violation. After discussion amongst the attorneys and the trial court, the trial court declared a mistrial and rescheduled the trial for a date in January 2017.

{¶5} On January 12, 2017, Appellant filed a motion to dismiss both counts of the indictment filed against him on the ground that his state and federal constitutional rights against Double Jeopardy had been violated. Appellant argued that the State had willfully flouted its responsibilities to disclose evidence under the Ohio criminal rules. After the State filed a responsive brief, the trial court denied Appellant's motion to dismiss.

{¶6} Appellant again proceeded to trial on March 27, 2017. At trial, the State's first witness was Tyler's father. John Miller testified he discovered Tyler had a drug problem in March 2015. Tyler, who worked in his family's plumbing and electric business, was exhibiting erratic behavior. After the drug problem was confronted, Tyler presented to L&P services for outpatient treatment and attended NA meetings. He did not want to go to inpatient rehabilitation.

{¶7} In the fall of 2015, Tyler overdosed. He was successfully revived with Narcan and continued his outpatient drug counseling through the fall of 2015. In early December 2015, Tyler acknowledged that he needed inpatient rehab. Tyler went into Camden Clark for 5-6 days and then

went into Parkside drug and alcohol rehabilitation in Columbus for over a month.[1]

{¶8} John Miller specifically testified Tyler's cell phone and wallet were in the Millers' possession while he was at inpatient rehabilitation in Columbus. Tyler also parked his truck at his parents' house. While Tyler was in rehab, his mother, Jill Miller, searched his wallet several times and found no illegal drugs inside it.

{¶9} Tyler was discharged from Parkside on January 15, 2016, and his parents and his girlfriend, Josie Schau, drove to Columbus to bring him home. The group stopped in Zanesville to eat and arrived at the Millers' home around 7:00 p.m. On the way home, Tyler was in good spirits, talking about the future and even singing along with the radio. Tyler indicated he wanted to become an addiction counselor so he could help others. John Miller saw no indication his son was using any drug.

{¶10} Upon return to the Millers' home, Tyler retrieved his wallet and cell phone. His truck battery seemed to be dead, so Josie drove Tyler to his residence in Beverly where he lived with his sister, Samantha Miller. John Miller last saw his son alive between 7:00 and 8:00 p.m. on January 15, 2016.

---

[1] Information regarding L&P Services, Camden Clark, and Parkside was not further developed in testimony.

{¶11} The next morning, January 16, 2016, John Miller texted Tyler to see if he wanted to go hunting. Tyler did not reply. John Miller proceeded to go hunting alone, and he returned home between 3:00 and 3:30 p.m. Since neither parent had heard from Tyler, John Miller went to Samantha's house and knocked on the door. When no one answered, Mr. Miller opened the door and called out again. John Miller soon found Tyler lying motionless with his wallet lying beside him and immediately called 911, but emergency personnel were never able to revive Tyler.

{¶12} After emergency personnel and law enforcement left the scene, Jill Miller and Samantha were looking through Tyler's wallet and found something which looked like a small rock, wrapped in a piece of paper. They immediately contacted law enforcement. John Miller concluded his direct testimony acknowledging that Tyler had available funds, his regular paycheck and a Christmas bonus, in his bank account when he returned from rehabilitation.

{¶13} Josie Schau next testified that she and Tyler had been in a relationship for 3 years at the time of his death. Josie discovered that Tyler was using heroin only after he overdosed in the summer of 2015. Tyler had never used heroin in her presence.

{¶14} Although Tyler did not have his cell phone with him at Parkside, he called Josie regularly. While in rehab, Tyler's mood changed and he seemed happy again.

{¶15} Josie's testimony correlated with John Miller's. When Josie accompanied the Millers to bring Tyler home, she also noticed he was in a good mood and making plans for the future. Josie testified after driving Tyler home, she stayed and visited Tyler and Samantha while Tyler cleaned the receipts out of his wallet and played with his dog. When Samantha went to bed, Tyler and Josie watched a movie together. During the entire time Josie was with Tyler on January 15th, she never observed him using drugs.

{¶16} Josie left at 11:00 p.m. on January 15, 2016. At that time, Tyler was still happy and thankful, reiterating that it had been a good decision to go into rehab. When Josie reached her home, she texted Tyler to let him know she had arrived safely. He texted her a brief reply and then texted her later at 2:13 a.m. on January 16th. Josie did not receive Tyler's last text until morning. When she replied, he did not respond.

{¶17} Samantha Miller also testified to spending time with Tyler and Josie on the evening of January 15th and to noticing his positive and upbeat demeanor. Samantha went to bed between 9:00 and 10:00 p.m. When she awoke on January 16th, Tyler's door was shut. Samantha testified she could

hear his television and could hear him snoring.  Samantha left for work around 7:00 a.m.  She received a call from her father later that afternoon that Tyler had overdosed.

{¶18} When Samantha returned home, emergency medical personnel and law enforcement were there.  After they left, Samantha began cleaning and searching for drugs.  Samantha testified that she did not find any drugs in the home.  She also testified that she did not see any indication that Tyler had used drugs when she was with him the previous evening.

{¶19} On cross-examination, Samantha testified she did not know when Josie left, when Tyler went to sleep, or if he left during the night. Samantha helped her mother search Tyler's wallet after law enforcement left.  Within 30 minutes, the women found the substance which looked like a small rock, wrapped in paper in Tyler's wallet.

{¶20} The State's next witness, Patrolman Aaron Perine of the Beverly Police Department, testified he was dispatched to Tyler's address on January 16, 2016.  There, John Miller advised Perine that his son was dead in the bedroom.  Perine found Tyler lying on his back in black shorts.  Tyler was cold, unresponsive, and a brown substance was draining from his nose. Perine called for a squad and later, the coroner.

{¶21} Patrolman Perine identified and authenticated State's Exhibits A, B, and C, photographs of Tyler.  Exhibit A showed Tyler lying on his back.  His wallet was on the right side, a notepad was underneath him, and a half eaten bowl of ice cream was on his left side.  He further testified upon discovery, John Miller actually moved Tyler from his right side to his back.  Exhibit C showed a partial tin foil lying underneath Tyler, along with a cell phone.  Tyler's cell phone and the foil were immediately collected as evidence.  After law enforcement released the scene and left the home, the family called to report an unknown substance found inside the wallet.  When he returned to the scene and did a field test, the substance tested positive for heroin.

{¶22} Patrolman Perine also identified and authenticated Exhibits D and E.  Exhibit D depicted the wrapper with a brown substance inside, and the wallet.  Exhibit E depicted the piece of tin foil with unknown particles, found on the floor of the bedroom.

{¶23} On cross-examination, Patrolman Perine testified he had been made aware that Tyler had an addiction.  When he entered the bedroom and noticed a substance oozing from Tyler's nose, he immediately suspected an overdose.

{¶24} Patrolman Perine testified he initially searched Tyler's room for anything which may have caused his death. Patrolman Perine didn't know how he missed the heroin in Tyler's wallet, but he might have overlooked it in one of the folds and had no reason to believe the heroin was placed there after Tyler's death.

{¶25} The next witness was Detective Scott Parks, a 20-year employee of the Washington County Sheriff's department. Detective Parks testified he performs forensic recovery of data from electronic devices such as cell phone and computers. Detective Parks had been trained and performing forensic recovery since 2011.[2] He testified he was asked to examine Tyler Miller's cell phone, a Samsung Galaxy S5, and later, two cell phones belonging to Appellant. Appellant had an older "flip phone" and a newer IPhone.

{¶26} Detective Parks explained his job entails downloading evidence from a phone and supplying it to whomever the investigating officer is for review. He reviewed information from Tyler Miller's cell phone and from Appellant's IPhone. Detective Parks was able to narrow the information and "parse out" a text conversation between Tyler Miller's and Appellant's devices. He then passed the information along to Lieutenant Lockhart.

---

[2] Parks testified at length about his training and certification through the Department of Homeland Security and through online schools. He is also the only person certified to teach electronic evidence in the police academy in southeast Ohio.

{¶27} Detective Parks identified and authenticated State's Exhibit F, a document entitled "Extraction Report," which showed a text conversation between Appellant and Miller, the "participants" listed on the extraction report. The first text between the devices occurred on November 30, 2015 at 1:12 p.m. Parks also identified the last page of Exhibit F as being a log of phone calls between the two devices. Tyler received a call from Appellant's phone on December 15, 2015 and another call on at 1:18 a.m. on January 16, 2016. There was no call activity between those dates.

{¶28} On cross-examination, Detective Parks testified he was a member of the Drug Task Force and took part in many investigations involving drugs. He admitted he initially had some difficulty breaking through the secure passcode on Miller's phone. He also testified that Appellant's phone was not set up to protect access to information. And, he acknowledged that phone contacts are usually entered into a device by the person who owns it, not the contact person.

{¶29} The second day of trial began with the testimony of Dr. Matthew Juhascik, chief toxicologist at the Montgomery County Coroner's Office. Dr. Juhascik testified he prepared a report concerning the results of toxicological tests on samples provided from Tyler Miller's body. Samples are obtained as part of the routine business of the Montgomery County

coroner's office. The final toxicology report, dated March 10, 2016, was prepared in the normal course of business of the coroner's office.

{¶30} Dr. Juhascik testified an eight-panel screen tested positive for opiates so a confirmation test was performed. The confirmation test demonstrated a presence of morphine in the femoral blood at a level of 136 nanograms per milliliter. He explained that morphine is a metabolite of heroin and that morphine is left in the body after the body processes heroin. He testified the results of the toxicology report were consistent with a heroin overdose.

{¶31} The next witness testifying was Dr. Robert Shott, a deputy coroner and forensic pathologist with the Montgomery County Coroner's Office. He examined Tyler Miller's body on January 17, 2016. Dr. Shott also identified State's Exhibit J, a copy of the autopsy report.

{¶32} Dr. Shott further testified that he requested the toxicological exam performed from samples taken from Tyler Miller's body. The Miami Valley Regional Crime Lab Toxicology Division works with the Montgomery County Coroner's Office. The toxicology report is incorporated into his autopsy report. Dr. Shott opined, to a reasonable degree of medical certainty, that heroin intoxication was the cause of Tyler's death.

{¶33} On cross-examination, Dr. Shott testified he had no previous history of Tyler having diabetes and therefore, this did not factor into his testing.  He also explained that heroin is broken down into the body as morphine.  He confirmed that the level of 136 nanograms of morphine was enough to be the cause of death.  Dr. Shott testified the 136 nanogram level is consistent with other overdose deaths he has evaluated.

{¶34} On the third day of trial, defense counsel began by objecting to admission of the extraction report from Appellant's IPhone, Exhibit I captioned "Vogt Phone."  He argued that the report included a number of texts that were not provided to him.  He acknowledged that, on the basis of Crim.R. 16, he had objected to the information at the previous proceeding which had ended in mistrial.  The trial court overruled the objection.

{¶35} The last State's witness was Detective Bryan Lockhart.  During his investigation, he focused upon the text communications between Tyler Miller's and Appellant's cell phones.  In Detective Lockhart's opinion, the conversations indicated a drug user and drug dealer relationship between Tyler and Appellant.  His testimony correlated with Detective Parks, and he also identified the extraction reports.

{¶36} Detective Lockhart further testified that based on the text message conversations, he determined to obtain a search warrant of

Appellant's residence.  During the execution of the warrant, Lockhart interviewed Appellant.  The interview, Exhibit K, was recorded and was played for the jury.

{¶37} Throughout much of the interview, Appellant denied knowing Tyler Miller.  He advised Lockhart that "millions" of other people used his cell phone.  Appellant was unable or unwilling to give the identity of one other person who may have used his phone.  Toward the middle of the interview, Appellant indicated he might have gone with another person, Cory Forshey, who may have sold drugs to Tyler Miller.  He testified Cory Forshey was a childhood friend of his who had "turned into someone else."

{¶38} At this point, the State moved to admit the following exhibits: A-C, photographs of Tyler Miller's body; D-paper wrapper with rock of heroin; E-wrapper with tin foil; F-extraction report from Tyler Miller's cell phone; G-evidence from the Beverly Police Department; H-the Bureau of Criminal Identification and Investigation (BCI) lab report; I-extraction report from Appellant's IPhone; J-coroner's report; and K-Appellant's recorded interview.  The State rested.

{¶39} Defense counsel made a Crim.R. 29 motion to dismiss Count 1, involuntary manslaughter, arguing that the State had not met its burden that Appellant knowingly caused Tyler's death as a proximate result of

trafficking in drugs. He asserted there was no evidence of Appellant's culpable mental state except for, arguably, the weak evidence of text messages. Counsel also pointed out an absence of other evidence indicating Appellant engaged in drug trafficking. Finally, counsel suggested that Tyler's choice to use heroin was a significant intervening factor which proximately caused his overdose. The trial court denied the motion.

{¶40} The jury returned a verdict of guilty on both counts and Appellant was sentenced to a six-year prison sentence for count one and an eleven-month prison sentence for count two, to be served concurrently, for an aggregate prison term of six years.

{¶41} This timely appeal followed. As indicated above, additional facts will be set forth below where necessary.

## ASSIGNMENT OF ERROR THREE

{¶42} For ease of analysis, we begin with consideration of Appellant's third assignment of error.

## STANDARD OF REVIEW

{¶43} "Appellate courts apply a de novo standard of review when reviewing the denial of a motion to dismiss an indictment on the grounds of double jeopardy." *State v. Johnson,* 4th Dist. Ross No.16CA3579, 2017-Ohio-7257, at ¶ 11, quoting *State v. Anderson,* 148 Ohio St.3d 74, 2016–

Ohio–5791, 68 N.E.3d 790, ¶ 20.  But when the dismissal motion is based on a challenge to a trial court's underlying declaration of a mistrial, we apply an abuse of discretion standard of review to that part of our analysis. *See State v. Carter,* 4th Dist. Adams No. 15CA1015, 2016–Ohio–5371, at ¶ 38, citing *United States v. Keane,* 287 F.3d 229, 233–234 (1st Cir.2002); *United States v. Williamson,* 656 Fed.Appx. 175, 180 (6th Cir.2016) (appellate court reviews de novo a trial court's denial of a motion to dismiss based on double jeopardy, but reviews the trial court's underlying decision to grant a mistrial for abuse of discretion); *State v. Gunnell,* 132 Ohio St.3d 442, 2012–Ohio–3236, 973 N.E.2d 243, ¶ 28–29 (applying an abuse of discretion standard of review to a trial court's declaration of mistrial).

## LEGAL ANALYSIS

{¶44} On January 12, 2017, Appellant filed a motion to dismiss the indictment on the ground that further proceedings would violate his right against double jeopardy as guaranteed by the Fifth Amendment of the U.S. Constitution and Article 1 Section 10 of the Ohio Constitution.  In Appellant's brief in support of his motion, Appellant set forth the procedural history leading up to the mistrial.  Appellant challenged the admission of texts extracted from a separate analysis of his IPhone, asserting that the texts were not admissible pursuant to Crim.R. 16.  Crim.R. 16 (B)(1), discovery,

generally provides that upon receipt of a written demand for discovery by the defendant, the prosecuting attorney shall provide copies or photographs of any written or recorded statement by the defendant which is material to the preparation of a defense, or is intended for use by the prosecuting attorney as evidence at the trial.

{¶45} In chambers, the State acknowledged that the texts from Appellant's IPhone had not been provided because they had not been intended for use at trial, except for possible rebuttal. However, defense counsel's opening statement indicated the defense strategy would be to shift blame to another person, Cory Forshey, as a person who had access and who may have used Appellant's phone during the relevant time period. Furthermore, it was indicated Appellant might take the stand to testify in this manner. The texts at issue demonstrated a conversation between Appellant and his girlfriend at the relevant times, which would also strongly suggest that Appellant was in control of his cell phone at the same time a discussion regarding the purchase of heroin by Tyler Miller was taking place.

{¶46} Based upon the above discussion in chambers, the State indicated the texts at issue would now need to be utilized during the State's case in chief. Defense counsel asserted that the admission of the text messages would create a conflict of interest for him as he represented Cory

Forshey in an unrelated matter in West Virginia.  For the reasons which follow, we agree with the trial court's finding that a mistrial was necessary and thus, did not abuse its discretion in ordering a mistrial.  Further, we agree with the trial court's finding that the State's failure to provide the additional texts was not prosecutorial misconduct intentionally calculated to create or invite a mistrial.  Consequently, we find the trial court did not err by denying Appellant's motion to dismiss.

{¶47} "The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution ensures that a state may not put a defendant in jeopardy twice for the same offense." *Johnson, supra*, at ¶ 13, quoting *State v. Gunnell,* 132 Ohio St.3d 442, 2012–Ohio–3236, 973 N.E.2d 243, at ¶ 25, citing *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056 (1969).  The Double Jeopardy Clause also "affords a criminal defendant a 'valued right to have his trial completed by a particular tribunal.' " *Johnson, supra,* quoting *Oregon v. Kennedy,* 456 U.S. 667, 671–672, 102 S.Ct. 2083 (1982), quoting *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834 (1949); *Gunnell* at ¶ 25. The right attaches when a jury is impaneled and sworn, *State v. Meade,* 80 Ohio St.3d 419, 424, 687 N.E.2d 278 (1997), citing *Crist v. Bretz*, 437 U.S. 28, 35, 98 S.Ct. 2156 (1978); *see also State v. Baranski,* 173 Ohio App.3d 410, 2007–Ohio–4072, 878 N.E.2d 1058, ¶ 7.  We apply the same analysis

to claims brought under the federal and Ohio Double Jeopardy Clauses because we have recognized that " '[t]he protections afforded by the two Double Jeopardy Clauses are coextensive.' " *State v. Anderson,* ¶ 31, quoting *State v. Brewer,* 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 14, quoting *State v. Martello,* 97 Ohio St.3d 398, 2002-Ohio-6661, 780 N.E.2d 250, ¶ 7.

{¶48} In the present matter, after Appellant objected to the admission of the texts and explained his possible conflict, the record indicates that after discussion was had both on and off the record, the court declared a mistrial. Appellant argues that the State's action in failing to disclose the text messages in violation of Crim.R. 16 forced or manipulated the court into the position where a mistrial was necessary and was imposed upon him. The record reflects defense counsel neither requested nor objected to the declaration of mistrial.

{¶49} The Supreme Court of Ohio held in *Anderson* that "when a mistrial was 'instigated by prosecutorial misconduct designed to provoke [the] mistrial,' retrial is barred by double jeopardy." *Id.* at ¶ 32, quoting *State v. Glover*, 35 Ohio St.3d 18, 517 N.E.2d 900 (1988), syllabus; *see also Oregon v. Kennedy,* 456 U.S. 667, 676, 102 S.Ct. 2083 (1982) (double jeopardy bars retrial if the prosecutor has engaged in misconduct intended to

"goad" the defense into moving for a mistrial); *Green v. United States*, 355 U.S. 184, 188, 78 S.Ct. 221 (1957) ("a prosecutor or judge [is prohibited] from subjecting a defendant to a second prosecution by discontinuing the trial when it appears that the jury might not convict").

{¶50} This court has also noted that the prohibition against double jeopardy precludes a second trial absent (1) a mistrial justified by a "manifest necessity" or (2) consent to the mistrial by the defendant. *Johnson, supra,* at ¶ 14, quoting *Klein v. Leis,* 548 F.3d 425, 431 (6th Cir.2008). "In determining whether a 'manifest necessity' exists, Courts need not find an absence of alternatives but only a 'high degree' of necessity." *Johnson, supra,* at 15, quoting *Klein* at 431. "What constitutes a 'manifest necessity' is left to the discretion of the courts, which must 'exercise a sound discretion on the subject [as] it is impossible to define all the circumstances, which would render it proper to interfere." *Gunnell,* 132 Ohio St.3d 442, 2012–Ohio–3236, 973 N.E.2d 243, at ¶ 26, quoting *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580 (1824).

{¶51} In Appellant's case, while the State failed to provide the texts during discovery, we do not find this omission was intentionally calculated to invite a mistrial. The texts at issue were between Appellant and his girlfriend and in preparing for trial, the prosecution would have likely been

focusing on the texts linking Appellant to Tyler Miller. Arguably, the omission could have been negligence. In *State v. Hodges,* 7th Dist. Mahoning No. 17MA0025, 2018-Ohio-447, the appellate court recently noted at ¶ 18, that "[a] retrial is not barred on double jeopardy grounds where the state's mere negligence, rather than intentional misconduct, required the trial court to grant a mistrial on a defense motion. *Hodges, supra,* citing *State v. Wood,* 114 Ohio App.3d 395, 400, 683 N.E.2d 354 (10th Dist.1996), citing *United States v. Dinitz*, 424 U.S. 600, 607,611, 96 S.Ct. 1075 (1976).

{¶52} More importantly, the State had no way of knowing Appellant's counsel represented Cory Forshey in an unrelated matter and hence, no way of knowing that use of the texts would place Appellant's counsel in the position of having a conflict of interest. Instead, any possibility of a conflict of interest would have been known to defense counsel when counsel was provided with the recorded interview of the State's response to discovery which was filed June 8, 2016. In its response to discovery, the State provided Appellant's counsel with the recorded interview in which Appellant attempts to shift any blame to his friend Cory Forshey. At this point, counsel should have considered the possibility of a conflict of interest in representing both defendants.

{¶53} The *Hodges* court also noted the state did not gain material advantage from the mistrial itself. *Id.* at ¶ 24. Similarly, we do not see that the State gained any material advantage from the mistrial. In fact, Appellant was additionally armed with the text messages at issue and gained advantage of time to further prepare his defense or to consider his alternatives.

{¶54} For the foregoing reasons, we find the trial court did not abuse its discretion in declaring a mistrial. We find an absence of evidence suggesting that the State engaged in intentional misconduct in order to necessitate a mistrial. And, the journal entry denying Appellant's motion to dismiss stated the trial court's reasoning as follows:

> "The Court FINDS that the failure to provide the texts during discovery did not create the conflict of interest which resulted in the mistrial of this case as any conflict of interest which existed was known to Defendant long before the State's revelation of the additional texts. The court further FINDS that the State's failure to provide the additional texts was not misconduct intentionally calculated to create or invite mistrial."

{¶55} While defense counsel did not request the mistrial, defense counsel asserted that there was a "possible conflict of interest." As set forth above, what constitutes a manifest necessity is left to the discretion of the trial court. While not explicitly finding a manifest necessity, the trial court was obviously concerned about a possible conflict of interest as defense counsel emphasized this argument.

{¶56} We conclude the court's decision constituted an implicit finding that the possible conflict of interest, as vigorously asserted by defense counsel when arguing the alleged Crim.R. 16 violation, created a manifest necessity for the mistrial. As such, the protection afforded by the prohibition against double jeopardy did not attach. The trial court did not err in denying Appellant's motion to dismiss the indictment. We hereby overrule Appellant's third assignment of error.

## ASSIGNMENTS OF ERROR ONE AND TWO

{¶57} Under assignment of error one, Appellant argues his conviction for involuntary manslaughter is not supported by sufficient evidence. Under assignment of error two, he argues his convictions for involuntary manslaughter and drug trafficking are against the manifest weight of the evidence. Because the matters are interrelated, we consider Appellant's first and second assignments of error jointly.

## STANDARD OF REVIEW

{¶58} In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest

miscarriage of justice that the conviction must be reversed. *State v. Lamb*, 4th Dist. Scioto No. 17CA3796, 2018-Ohio-1405, ¶ 19; *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter,* 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.  The weight and credibility of evidence are to be determined by the trier of fact. *Lamb, supra,* at ¶ 20; *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1965, 15 N.E.3d 818, at ¶ 132.  The trier of fact is free to believe all, part, or none of the testimony of any witness, and we defer to the trier of fact on evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. *State v. Dillard,* 4th Dist. Meigs No. 13CA9, 2014-Ohio-4974, at ¶ 28; citing *State v. West,* 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, at ¶ 23.

LEGAL ANALYSIS

1. <u>Drug Trafficking</u>

**{¶59}** In recent years, appellate courts in Ohio have considered convictions for involuntary manslaughter involving drug overdose deaths, predicated on a drug offense conviction.  Here, Appellant's conviction for involuntary manslaughter was necessarily predicated upon trafficking in heroin.  Appellant contends the jury's verdict that he knowingly trafficked in

drugs was based solely upon text messages which did not establish that he sold or attempted to sell heroin.

**{¶60}** Appellant was convicted of drug trafficking in violation of R.C. 2925.03(A)(1). Thus, the State had to establish that Appellant knowingly sold or offered to sell a controlled substance or a controlled substance analog. A person acts "knowingly," when, regardless of purpose, the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). A person has knowledge of circumstances when the person is aware that such circumstances probably exist. *Id.* When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact. *Id.* A "controlled substance" means a drug, compound, mixture, preparation, or substance included in schedule I, II, III, IV, or V, as defined in R.C. 3719.01(C) of the Revised Code.

**{¶61}** We agree that Appellant's conviction for drug trafficking is based largely upon the circumstantial text messages evidencing communications between Tyler Miller and Appellant. However, we point out that "a defendant may be convicted solely on the basis of circumstantial

evidence." *Luther, supra,* at 19, quoting *State v. Nicely,* 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988). "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. "Circumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved. * * *' " *Nicely,* 39 Ohio St.3d at 150, 529 N.E.2d 1236, quoting Black's Law Dictionary (5 Ed.1979) 221.

{¶62} In *State v. Kramer,* 3rd Dist. Defiance No. 4-15-14, 2016-Ohio-2984, the defendant was convicted of involuntary manslaughter after allegedly selling heroin to the deceased, Matney, shortly before his death. On appeal, Kramer argued his conviction was against the manifest weight of the evidence, specifically that the jury improperly concluded that he provided the heroin that led to Matney's death. Kramer produced an alibi witness, a female acquaintance who testified that Kramer was with her and never left her presence during the relevant time period.

{¶63} The State presented a Defiance police officer, Campbell, who testified that he looked through text messages on Matney's cell phone. With the aid of exhibits, Campbell testified to the calls and text messages between

Matney's and Kramer's cell phones between relevant dates. Campbell also testified to contacts between Matney and the mother of his children. Campbell testified that based on the nature of the text message exchanges and his knowledge of "street language," the evidence pointed to Kramer's trafficking in drugs. Another witness, Horan, an FBI special agent, testified as to the location of Kramer's cell phone at the relevant times.

{¶64} Kramer took the stand in his own defense and testified that he never called Matney, Matney always contacted him. He admitted he had sold drugs to Matney in the past, but on the relevant date, he was actually trying to "put him off," and hoping that Matney would just find another supplier. The appellate court in *Kramer* affirmed the jury's verdict that Kramer's trafficking in heroin proximately resulted in Matney's death and that the verdict was not against the manifest weight of the evidence.

{¶65} Kramer's conviction was also based largely upon the circumstantial evidence of text message conversations between Matney and Kramer, introduced as evidence of a "user/seller" relationship. Here, Detective Lockhart's investigation and testimony focused on the text conversations between Tyler's cell phone and Appellant's IPhone. In Detective Lockhart's opinion, the content of the conversations indicated some type of illegal drug activity.

{¶66} Detective Lockhart identified Exhibit F, the extraction report, which identified various text conversations.[3]  A conversation between the two phones revealed a conversation on November 30, 2015 in which "price" and "location" were discussed.  Setting forth the conversations below, we reference Tyler's cell phone as "TP," and Appellant's IPhone as "AP."

{¶67} Detective Lockhart also testified to a text exchange on December 4, 2015.  This exchange signified to him that Tyler was trying to keep his addiction hidden from his girlfriend Josie, and correlated with her trial testimony that she was unaware that Tyler used heroin.  The extraction report revealed as follows:

> TP:     Well I passed my girlfriend right in front of the IGA.  So I kept driving lol but I'm coming back as soon as she texts me back.
>
> AP:    Ok.
>
> TP:    I'm sorry bro I just can't let her see me. Lol I gotta avoid her at all costs.

{¶68} Detective Lockhart also testified to a conversation between the users of the two phones which occurred on December 5, 2015.  In his opinion, the exchange was discussing how much Tyler wanted to purchase and how long it would be until the parties met.  Tyler's desire to keep his

---

[3] Detective Lockhart explained that, Exhibit F, a six-page document, showed text conversations on pages 1-5, and contained a call log on page 7.  He testified the document was not missing a page but was compiled as he had requested.

addiction from Josie was again evident. The following text conversation

occurred:

> TP:    Hey man I ain't gonna to be able to get that. Sorry about
> that."
>
> AP:    Ok man.
>
> TP:    Hey man I can't come to town cause I'm with my girl.
> But I have a buddy that's cool and lives in Marietta if you want
> to get rid of that half.

**{¶69}** Detective Lockhart also testified there was one more text

message on December 15, 2015 from Appellant's phone, to which there was

no response. Lockhart opined the lack of response coincided with Tyler

being in rehab in Columbus and not having access to his cell phone.

**{¶70}** Finally, Detective Lockhart also testified to a conversation

which took place one month later on January 15, 2016 at 11:23 p.m., which

was approximately twenty minutes after Josie testified she left Tyler's

residence. The exchange began with Tyler's initiation, occurred as follows:

> TP:    Hey man what's up?
>
> AP:    Yo.
>
> TP:    Sorry I haven't got at you man. I've been in rehab since
> December 4th.
>
> AP:    It's cool. Good for you man.
>
> * * *

TP:     Yeah it was all good, just not really by choice ya feel me?

AP:     I feel ya.

TP:     I'm just kickin it.

AP:     Like your hanging out or quitting the d?

{¶71} Lockhart testified from his time on the drug task force, "d" is slang used in text messages between traffickers and users, commonly meaning "heroin."  The exchange continued from Tyler's phone:

TP:     You still doing your thing?

AP:     Yeah.

TP:     Damn I wish my truck was running or I'd come in town tonight lol.

AP:     You need something or trying to kick it or what?

AP:     I just got my car back together the other day.  Had to put a new axle up front.

TP:     Damn, that sucks Bro. I was just thinking about picking up.

AP:     Up what?

TP:     Some of that d.

AP:     I'm around.  I'll drop by for a little extra.

{¶72} Detective Lockhart testified the significance of Tyler stating his truck wasn't running was that it correlates with his father's testimony that

his truck battery was dead.  It also correlates with both John Miller's and

Josie's testimony that Josie drove Tyler from his parents' home to his

residence in Beverly.  Detective Lockhart further testified that "I'll drop by

for a little extra," in his experience, occurred when a drug dealer delivers to

the user and usually charges more money.  Detective Lockhart also testified

about this exchange between the phones.  Tyler texted to Appellant's phone:

> TP:    And by the way, I got another question, lol.  Do you
> shoot?
>
> AP:    It doesn't matter, whatever is fine with me.
>
> TP:    Okay, well I'll just go down, whenever you leave.  And
> the only reason I was asking is because I didn't know if you had
> an extra clean point?

{¶73} During Detective Lockhart's testimony, he also testified about

conversations between the two in which topics of price, "rushes," and

quality were discussed.  Detective Lockhart testified that a "clean point"

meant a clean needle.  In addition, he explained that heroin can be snorted

through the nose or taken intravenously.   It appeared to him that Tyler was

trying to decide whether to use it intravenously or snort it.

{¶74} Detective Lockhart opined that, under the totality of the

circumstances, (1) knowing that Tyler had a heroin addiction; (2) looking at

the multiple days of contact between his phone and the one registered to

Appellant; and (3) seeing the overall content of the text discussions, the

relationship between the two young men was that of drug user and drug dealer. Detective Lockhart testified after reviewing the information, he determined to obtain a search warrant for Appellant's residence. During the execution of that warrant, Lockhart interviewed Appellant. The interview was recorded and played for the jury.

{¶75} The transcript and interview reveal that, after explaining Appellant's Miranda Rights to him, Detective Lockhart told him that his friend Tyler Miller had "passed away." Appellant denied knowing Tyler Miller and maintained he did not know Tyler throughout much of the interview. After advising that Tyler had Appellant's name and number stored in his cell phone, Appellant explained that "Somebody could have told [Tyler] that was me and my number, because you know, call me, it's my—my phone, and it's not even their phone. * * * I've had that happen to me a million times."

{¶76} Detective Lockhart next inquired as to whom Appellant might have let borrow or use his phone. Appellant stated "There's a lot of people that use my phone." Throughout the entire interview, Appellant denied knowing the names of any person who had used his phone.

**{¶77}** The trial transcript has indicated Appellant as "RV," and

Lieutenant Lockhart as "LL." The turning point of the interview appeared to

be at this exchange between Lockhart and Appellant:

RV: I don't even know who Tyler Miller is, but you guys already got who's responsible.

LL:   Responsible for what?

* * *

RV:   What you're in my face about. Come on now. You've got whose responsible.

LL:   Who's that?

* * *

RV:   Who I grew up with * * * and was friends with * * * turned into other people, and that's not my fault, so.

* * *

LL:   Are you saying you grew up with Tyler and he turned into someone else?

RV:   No, I don't know Tyler.

* * *

RV:   Well, Cory wasn't answering his phone, somehow Cory gave him my fucking number, so I ran Corey to go fucking do what he does, and then that's all I fucking know.

LL:   Okay. Cory (unintelligible).

* * *

RV:   I was chilling at my buddy's house, Cory Forshey.

LL:   Cory Forshey.  Okay. Okay.  Is that why the- - you arranged the price to be a little higher, because you said it wasn't yours, he was coming over to you?

RV:   No.

* * *

LL:   Okay. So I'm saying, did Cory go with you, then?  It's Cory's dope.

RV:   Yeah, bro, it was- -

* * *

LL:   Well, you said you wasn't alone, so you guys took your--you drove, but he rode with you.

RV:   I think he drove.

**{¶78}** Detective Lockhart testified he was familiar with Cory Forshey and believed he was involved in the sale of illegal drugs in Washington County.  He acknowledged that Tyler Miller had Cory Forshey's name stored under two numbers in his phone.  However, importantly, Detective Lockhart testified during the hours surrounding Tyler's death, there were no phone calls or texts between Tyler's phone and Corey Forshey.

**{¶79}** Detective Lockhart identified Exhibit I, an analysis of Appellant's phone.  He opined that Appellant was in possession of his phone during the relevant time period.  He explained that a text message

conversation on Appellant's phone demonstrated he was texting back and forth with his girlfriend Jessica Heilby.[4]  The analysis of Appellant's phone demonstrated that closely in time, whoever was in control of Appellant's phone was texting to Tyler Miller's phone and Jessica's phone.  For example, the text messages indicated Appellant was driving and he texted his girlfriend "I just got to Cory's.  I'm about to work on my car."  Detective Lockhart found this significant because Appellant's phone sent a text to Tyler's phone about the same time that read:  "Okay, let me know.  I'm about to work on my car."

{¶80} Later on, during the relevant time period, Appellant texted to his girlfriend: "Bout to Cory's" and later, "Just chillin in Cory's room."  To Detective Lockhart, these texts indicated that during the late evening hours of January 15th and the early morning hours of January 16th, Appellant was operating his own phone.  Detective Lockhart also pointed out that if Cory Forshey were using Appellant's cell phone, he would not be referring to himself in the third person.

{¶81} On cross-examination, Detective Lockhart admitted that although Cory Forshey was known to local law enforcement as a person involved in drugs, Appellant was not known to law enforcement in that

---

[4] Detective Lockhart testified he was able to verify Appellant's girlfriend by reviewing a picture she sent to Appellant, her phone number, and comparing the information with her BMV photos and her Facebook page.

manner.  He admitted that drug dealers tended to have their phones' security protected.  He admitted it was "not a far stretch" that Appellant let other people use his phone.

{¶82} Furthermore, Detective Lockhart acknowledged that it was possible that Appellant did not want to identify any persons to whom he had loaned his phone in order to keep a friend from getting into trouble.  He also acknowledged that no heroin, cash, "ledger," or packaging was found at Appellant's residence when the search warrant was executed.  And while digital scales and half of a straw were found there, no drug residue was found on them.

{¶83} Through Detective Lockhart's cross-examination, defense counsel was able to elicit testimony that it was possible that Tyler was a diabetic and thus, he could have been discussing a needle with Appellant in that context.  Defense counsel also emphasized that Appellant's girlfriend and sister were the last people to see him alive.  He also testified he was unaware if Tyler had heroin in his room prior to leaving for rehab, which he could have accessed easily upon his return.  And, he testified there was no acknowledgment on Tyler's phone that he received any heroin from Appellant during the relevant hours.

{¶84} Similar to the opinion in *Kramer,* after reviewing the entire record, we conclude Appellant's involuntary manslaughter conviction is not against the manifest weight of the evidence. Weighing heavily in favor of Appellant's conviction are: (1) the cell phone communications between Tyler Miller and Appellant's cell phones, appearing to discuss a transaction of heroin; and, the evidence indicating Appellant was in possession of his cell phone at the relevant times. However, similar to *Kramer,* there are other similarities.

{¶85} The *Kramer* court pointed out that Kramer's credibility and testimony were undermined. Kramer testified that Matney "always" contacted him first, yet the cell phone records revealed he had called Matney twice 6 days before his death. He was also unsure or mistaken about his whereabouts or the whereabouts of his own cell phone. While Appellant, unlike Kramer, has no prior criminal record, similarly, his credibility was a key issue for the jury.

{¶86} We find the jury likely construed Appellant's interview as lacking in believability and inconsistent with the text messaging set forth in the exhibits. As indicated above, Appellant repeatedly denied even knowing Tyler Miller yet the text messaging exhibits revealed multiple conversations between the phone numbers attributed to Appellant and Tyler Miller. The

jury likely found Appellant's explanation in the interview that Corey

Forshey and "millions" had access to or used his phone lacking in credibility

when the text messaging revealed that Appellant, or whomever was in

control of his phone, was texting Tyler Miller and Appellant's own

girlfriend almost simultaneously.  Furthermore, the jury likely found the

subjects in the text conversations corroborated factually with Tyler's father's

and Tyler's girlfriend's trial testimony.

{¶87} Kramer argued there was no "eye-witness" testimony regarding

a sale of heroin.  Similarly, Appellant argues no one saw him sell drugs or

even heard him speak of selling drugs in the past.  However, as the court

noted in *Kramer* at 53: "[E]yewitness testimony was not required to convict

Kramer, and the jury was free to consider the absence of eyewitness

testimony in weighing the evidence. *See State v. Huff,* 4th Dist. Scioto No.

14CA3596, 2015–Ohio–5589, ¶ 47–48."

{¶88} Appellant also points out the search warrant subsequently

executed at his home yielded no cash, baggies, drugs or paraphernalia

associated with drug trafficking.  Kramer argued similarly that there was no

packaging papers located at his residence.  The *Kramer* court also noted:

"[T]he State was not required to produce a bindle paper to support Kramer's

conviction, and the jury was again free to consider the absence of any packaging in weighing the evidence." *Id.* at 54.

**{¶89}** Finally, Appellant points out that Miller had overdosed in the past; Cory Forshey was a dealer in the area and was listed in Miller's phone under two separate numbers; it is unknown if Miller had other drugs in his possession; and there is a possibility that heroin that resulted in his death came from an unknown source. However, " ' "[w]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony." ' " *State v. Luther,* ¶ 18, quoting *State v. Cooper,* 170 Ohio App.3d 418, 2007-Ohio-1186, 867 N.E.2d 493 (4th Dist.), ¶ 17, quoting *State v. Mason,* 9th Dist. No. 21397, 2003-Ohio-5785, ¶ 17, quoting *State v. Gilliam*, 9th Dist. No. 97CA006757, 1998 WL 487085 (Aug. 12, 1998); *accord State v. Chancey,* 4th Dist. Washington No. 15CA17, 2015-Ohio-5585, ¶ 36, citing *State v. Wilson,* 9th Dist. Lorain No. 12CA010263, 2014-Ohio-3182, ¶ 24, citing *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Moreover, a conviction is not against the manifest weight of the evidence even if the "evidence is subject to different interpretations." *State v. Adams,* 2nd Dist. Greene Nos. 2013CA61, 2013–CA–62, 2014-Ohio-3432, ¶ 24.

{¶90} Through opening statement and closing argument, Appellant's counsel emphasized an absence of any direct evidence against Appellant and asserted the weakness of the circumstantial text messaging evidence against him. Defense counsel urged an interpretation of the evidence which suggested that Appellant's old friend Cory Forshey, or some other person, was in control of Appellant's phone and transacted a drug deal with Tyler Miller just hours before he died. The jury apparently believed the prosecution's interpretation of the evidence. For the reasons above, we do not find this to be an exceptional case and we cannot conclude that the trier of fact clearly lost its way and created such a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered. We find Appellant's conviction for trafficking in drugs, based largely on the text messaging evidence and recorded interview, is not against the manifest weight of the evidence.

2. Involuntary Manslaughter

{¶91} Under Appellant's second assignment of error, arguing his involuntary manslaughter conviction is against the manifest weight of the evidence, Appellant does not make new specific arguments but reiterates that the verdict was based upon text messages and emphasizes the absence of other evidence against him, as set forth above.

**{¶92}** Involuntary manslaughter, R.C. 2903.04(A), relevant in this case, provides: "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." *State v. Grube,* 2013-Ohio-692, 987 N.E.2d 287, (4th Dist.), at ¶ 39. The culpable mental state of involuntary manslaughter is supplied by the underlying offense. *Id. State v. Johnson,* 8th Dist. No. 94813, 2011-Ohio-1919, at ¶ 54, citing *State v. Wilson,* 182 Ohio App.3d 171, 2009-Ohio-1681, 912 N.E.2d 133, motion for delayed appeal granted 123 Ohio St.3d 1505, 2009-Ohio-6210, 917 N.E.2d 809, cause dismissed 124 Ohio St.3d 1424, 2010-Ohio-20, 919 N.E.2d 748.  In *State v. Brown,* 3rd Dist. Hancock No. 5-17-19, 2018-Ohio-899, the appellate court explained:

> "The 'criminal intent of involuntary manslaughter is supplied by the criminal intent to do the underlying unlawful act of which the homicide is a consequence.' *State v. Potee,* 2017–Ohio–2926, ―― N.E.3d ――, ¶ 32 (12th Dist.). *State v. Mansfield*, 2016–Ohio–8189, 69 N.E.3d 767, ¶ 18 (2nd Dist.); *State v. Grube*, 2013–Ohio–692, 987 N.E.2d 287, ¶ 39 (4th Dist.); *State v. Lutman,* 6th Dist. Lucas No. L–97–1447, 1999 WL 435196, *6 (June 30, 1999); *State v. Losey*, 23 Ohio App.3d 93, 491 N.E.2d 379 (10th Dist.1985)."

**{¶93}** The appellate court in *Brown* recently considered his argument that his involuntary manslaughter conviction, based on a predicate offense of corrupting another with drugs, was not supported by sufficient evidence. The appellate court simply concluded at ¶ 30:

"Since we have found Brown's arguments against his conviction for corrupting another with drugs are without merit, his conviction for involuntary manslaughter has a properly supported predicate convictions and withstands the sufficiency of the evidence analysis."

Likewise, Appellant's conviction for trafficking with drugs is not against the manifest weight of the evidence and thus, his conviction for involuntary manslaughter has a properly supported predicate conviction. Thus, we find no merit to Appellant's second assignment of error.

{¶94} Similar to the abbreviated analysis in *Brown,* our decision in *State v. Wickersham,* 4th Dist. Meigs No. 13CA10, 2015-Ohio-2756, at ¶ 27, allows for disposition of Appellant's involuntary manslaughter conviction sufficiency challenge in summary fashion. However, under Appellant's first assignment of error arguing the sufficiency of his involuntary manslaughter conviction, Appellant makes a different and distinct argument. Appellant asserts that, assuming he delivered heroin to Tyler Miller, he could not have legally foreseen Miller's death because he could not have known that the effects of a small amount of heroin could be magnified due to Miller's time in the drug rehabilitation program. Appellant concludes that the evidence against him is insufficient because:

1) He cannot be held responsible for the consequences that a reasonable person could not expect to follow from his conduct; and,

2) He cannot be held responsible in light of Dr. Shott's testimony that it is possible that a person who had just been in rehab and was presumably drug-free could overdose more easily.

**{¶95}** When a court reviews a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Lamb,* ¶ 18, quoting *State v. Maxwell,* 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146; quoting *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781 (1979). "The court must defer to the trier of fact on questions of credibility and the weight assigned to the evidence." *State v. Dillard,* 4th Dist. Meigs No. 13CA9, 2014-Ohio-4974, at ¶ 22; citing *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132.

**{¶96}** Our review of Ohio law demonstrates that Appellant herein is not the first defendant to argue as to the "foreseeability" of a death occurring as a result of a conviction for trafficking in drugs or corrupting another with drugs. Generally, other courts have rejected this argument.

**{¶97}** In *State v. Sabo*, 3rd Dist. Union No. 14-09-33, 2010-Ohio-1261*,* the defendant allegedly transported liquid methadone and other drugs to Union County, Ohio, where he shared them with another individual who

later overdosed. Sabo was later convicted of involuntary manslaughter.

Sabo argued his conviction was not based on sufficient evidence and was

against the manifest weight of the evidence. In reviewing his appeal, the

appellate court noted at ¶ 25:

> "This Court has previously cited to the 10th District's decision in *State v. Losey*, 23 Ohio App.3d 93, 94-95, 491 N.E.2d 379 (10th Dist. 1985), for guidance on the intention of the Legislature in its use of "proximate result" under R.C. 2903.04. *See Shoemaker*, 2006-Ohio-5159, at ¶ 65. In that decision, the 10th District stated as follows:

> Under [R.C. 2903.04], defendant cannot be held responsible for consequences no reasonable person could expect to follow from his conduct; he will be held responsible for consequences which are direct, normal, and reasonably inevitable-as opposed to extraordinary or surprising-when viewed in the light of ordinary experience. In this sense, then, "proximate result" bears a resemblance to the concept of "proximate cause" in that defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct. *State v. Chambers,* 53 Ohio App.2d 266, 373 N.E.2d 393 (9th Dist. 1977). Here, that means that death reasonably could be anticipated by an ordinarily prudent person as likely to result under these or similar circumstances. *See State v. Nosis*, 22 Ohio App.2d 16, 457 N.E.2d 414 (9th Dist. 1969). *Losey*, 23 Ohio App.3d at 95, 491 N.E.2d 379."

{¶98} Sabo argued that there was insufficient evidence that his

aggravated trafficking of drugs proximately caused the victim's death.

Specifically, he claimed that given the evidence presented at trial, only the

liquid methadone could be associated with him, and neither expert witness

could say which one of the five significant drugs found through testing

caused the victim's death.  Sabo concluded it was unforeseeable for him to

have known that the victim had toxic levels of other significant drugs in his

body when he administered the liquid methadone.  The appellate court

disagreed, based on the evidence presented in Sabo's case.  Citing *State v.*

*Baksi* (Dec. 23, 1999), 11th Dist. No. 98-T-0123, at *16 and *State v.*

*Grunden*, 65 Ohio App.3d 777, 783-84, 585 N.E.2d 487 (3rd Dist. 1989),[5]

the *Sabo* court noted at ¶ 27:

> "While Michael's death was the result of the effects of taking
> multiple drugs, and neither expert could pinpoint which exact
> drug caused Michael's death, we believe that a fatal
> consequence was within the foreseeable scope of risk created
> by Sabo's conduct in administering the liquid methadone when
> there was ample evidence regarding Michael's inebriated
> condition, the fact that he and Sabo had taken other substances
> together that night, and the fact that Sabo had even warned
> Michael about using the liquid methadone."

{¶99} Other courts have addressed the foreseeability argument within

the context of a manifest weight of the evidence analysis.  In *State v. Wells,*

12th Dist. Warren No. CA2016-02-009, 2017-Ohio-420, the decedent

traveled to Wells' home to exchange his prescription for illegal drugs.

After obtaining "dope" and injecting himself, the victim immediately

---

[5] The *Baksi* court found that there was sufficient evidence to support involuntary manslaughter conviction when evidence showed defendant prepared an extremely strong hit of heroin and gave the loaded syringe to another inmate who was known to abuse drugs. *Grunden* held that reasonable minds could have concluded at the close of the State's case that the infant's death was proximately caused by the defendant's conduct in leaving a gram of cocaine unattended on a coffee table, well within the reach and propensities of a thirteen-month-old child.

overdosed. Testing later revealed he had cocaine metabolites and fentanyl in his system at the time of death. At trial, a forensic pathologist and coroner testified that the level of fentanyl in his system caused him to stop breathing. The appellate court found that given the evidence before it, the jury did not lose its way in finding that Wells' actions caused the overdose death. The appellate court stated at ¶ 39:

> "There is nothing extraordinary or surprising about the manner of [the victim's] death in relation to appellant's actions. Appellant provided drugs to a known drug abuser. *The possibility of an overdose is a reasonably foreseeable consequence of providing a controlled substance to another.* (Emphasis added). *See, e.g., State v. Patterson,* 11th Dist. Trumbull No. 2013–T–0062, 2015–Ohio–4423, ¶ 80–95; *State v. Zusman,* 11th Dist. Lake No. 2014–L–087, 2015–Ohio–3218."

**{¶100}** In *State v. Veley*, 6th Dist. Lucas No. L-16-1038, 2017-Ohio-9064, Veley argued that the victim's death in his case was not a "reasonably inevitable" result of the alleged drug transaction between the deceased and himself. Veley argued that the victim had purchased heroin over 100 times from him and as such, his death from an overdose was not likely or foreseeable. The *Veley* court observed at ¶ 25:

> "Reviewing appellant's argument relating to the general foreseeability issue, we find that in the past decade Ohio courts have widely recognized that death by overdose of an illegal or illegally sold substance is a foreseeable result; inevitability has not been held to be the standard. For example, addressing foreseeability in a case where the defendant sold the deceased

heroin and fentanyl and was convicted of involuntary manslaughter, the court noted that " 'when the result varied from the harm intended or hazarded, it must be determined that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable.' " *State v. Potee,* 12th Dist. Clermont No, CA2016–06–045, 2017-Ohio-2926, ¶ 33, —— N.E.3d ——, quoting *State v. Hall,* 12th Dist. Preble No. CA2015-11-022, 2017-Ohio-879, ¶ 78. The court further stated that "a defendant will be held responsible for foreseeable consequences 'which are known to be, or should be known to be, within the scope of the risk created by his conduct.' " *Id.,* quoting *Hall* at ¶ 79. *See State v. Patterson,* 11th Dist. Trumbull No. 2013-T-0062, 2015-Ohio-4423, ¶ 91 ("The possibility of an overdose is a reasonably foreseeable consequence of the sale of heroin."). Further, " 'for something to be foreseeable does not mean that it be actually envisioned.' " *State v. Wells,* 12th Dist. Warren No. CA2016-02-009, 2017-Ohio-420, ¶ 35, quoting *State v. Lovelace,* 137 Ohio App.3d 206, 219, 738 N.E.2d 418 (1st Dist.1999)."[6]

**{¶101}** The Fifth District, however, reached the conclusion that there was insufficient evidence to convict a defendant of involuntary manslaughter in *State v. Kosto,* 5th Dist. Licking No. 17CA54, 2018-Ohio-1925.  There, Baker, the decedent, overdosed.  His toxicology report revealed he had heroin, cocaine, and marijuana in his system.  Law enforcement investigators recovered some of Baker's deleted cell phone texts which showed text conversations between Kosto and Baker the day before he died.

---

[6] The *Veley* court also noted that the suggestion that the ingestion of a fatal drug was an intervening act itself had been rejected. *Id.,* at ¶ 28; *State v. Baksim* 11th Dist. Trumbull No. 98-T-0123, 1999 WL 12992927 (Dec. 23, 1999).

Kosto admitted he had deleted some of his texts because it looked like he had provided Baker with heroin.

{¶102} Making a sufficiency argument on appeal, Kosto directed the appellate court to *Burrage v. United States,* 571 U.S. 204, 134 S.Ct. 881, 892 (2014). There, the United States Supreme Court held that "* * * at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." *Id.* at 892.[7] The Court stated: "The language Congress enacted requires death to 'result from' use of the unlawfully distributed drug, not from a combination of factors to which drug use merely contributed." Id. at 891.

{¶103} The *Kosto* court pointed out the State of Ohio was required to prove under R.C. 2903.04(A) that the defendant had caused the death of Baker as a proximate result of his committing or attempting to commit the felony offense of corrupting another with drugs under R.C. 2925.02(A)(3).

---

[7] *Burrage* involved the challenge of a penalty enhancement provision under 21 U.S.C. Sec. 841(b)(1)(C). The federal statute at issue imposed a 20–year mandatory minimum sentence on a defendant who unlawfully distributes a Schedule I or II drug, when "death or serious bodily injury results from the use of such substance." The United States Supreme Court in *Burrage* granted certiorari on two questions, the first of which was whether the defendant could be convicted under the "death results" provision when the use of the controlled substance was a "contributing cause" of the death. *Id.* at 886. The Court first determined that the federal statute in question imposes a requirement of "but-for causation." *Id.* at 889–891. Although the Government proposed the argument that an act or omission should be considered a cause-in-fact if it was a "substantial" or "contributing" factor in producing a given result, this was rejected by the Court. *Id.* at 890.

The indictment and the bill of particulars both alleged that the cause of Baker's death was based on the felony of corrupting another specifically with heroin. However, the record in that case revealed that the theory was not fully consistent with the forensic pathologist's investigation.

{¶104} The pathologist specifically testified that "acute combined drug effects" from "[u]sing heroin and cocaine" were the cause of Baker's death. The pathologist also could not opine on cross-examination that Baker would have died from the heroin use in and of itself. In other words, there is arguably a reasonable probability that but for the use of cocaine, the death would not have occurred. Appellant was not charged with providing cocaine to Baker, nor did the State pursue a theory that appellant did so. The *Kosto* court concluded at ¶ 23: "[A]s in *Burrage*, "[n]o expert was prepared to say that [the victim] would have died from the heroin use alone."[8]

{¶105} Based on the above, we also reject Appellant's foreseeability argument. Other Ohio courts have consistently found that the possibility of an overdose is a reasonably foreseeable consequence of providing a

---

[8] The *Kosto* court further opined at ¶ 24:"We recognize that in *Burrage*, the United States Supreme Court was interpreting a penalty enhancement provision in a federal statute, not an Ohio criminal statute. However, this distinction does not dissuade us from applying the rationale of *Burrage* herein, and "* * * we cannot amend statutes to provide what we consider a more logical result." *State v. Link*, 155 Ohio App.3d 585, 2003-Ohio-6798, 802 N.E.2d 680, ¶ 17, citing *State v. Virasayachack* (2000), 138 Ohio App.3d 570, 741 N.E.2d 943. Accordingly, upon review, we find insufficient evidence was presented for reasonable fact finders to conclude beyond a reasonable doubt that appellant was guilty of involuntary manslaughter as charged by the State."

controlled substance to another. In this case, Appellant was indicted specifically for trafficking in heroin.

{¶106} Dr. Juhascik, a toxicologist with the Montgomery County Coroner's Office, testified that the results in the toxicology report were consistent with a heroin overdose. The report was given to Dr. Robert Shott, the Montgomery County Coroner, who prepared an opinion as to Tyler's cause of death. Dr. Shott explained that 136 nanograms per milliliter found in Tyler's femoral blood was enough to be a fatal overdose, and he opined, to a reasonable degree of medical certainty, that Tyler's cause of death was heroin intoxication.

{¶107} Not only is Appellant's conviction for involuntary manslaughter supported by sufficient evidence, based solely on the fact it is a predicate offense, we also find any rational trier of fact could have found all the elements of involuntary manslaughter proven beyond a reasonable doubt. Thus, his conviction is also supported by sufficient evidence. As such, we overrule Appellant's first assignment of error and affirm the judgment of the trial court.

## ASSIGNMENT OF ERROR FOUR

{¶108} Appellant argues the trial court erred in failing to instruct the jury as to the lesser-included offense of reckless homicide. Additionally,

Appellant contends that he was denied the effective assistance of counsel when his attorney failed to request an instruction on reckless homicide. Appellant raises two separate and significant arguments; however, we note that he has failed to separately argue the assignments of error as required by App.R. 16(A)(7). While App.R. 12(A)(2) provides authority to disregard assignments of error on this basis, we may still address the assignments in the interest of justice. *State v. Matzinger*, 81 N.E.3d 841, 2017-Ohio-324, (4th Dist.) at ¶ 28; *State v. Reye,* 9th Dist. Lorain No. 15CA010770, 2016-Ohio-3495, 2016 WL 3387769, ¶ 5. *See also Comisford v. Erie Ins. Property Cas. Co.,* 4th Dist. Gallia No. 10CA3, 2011-Ohio-1373, at ¶ 29. Because in this case it appears to be a simple matter of form, we proceed to consider both arguments.

STANDARD OF REVIEW

{¶109} Our review of whether a jury instruction is warranted is de novo. *State v. Schwendeman*, 4th Dist. Athens No. 17CA7, 2018-Ohio-240, at ¶18; *State v. Depew,* 4th Dist. Ross No. 00CA2562, 2002-Ohio-6158, at ¶ 24 ("While a trial court has some discretion in the actual wording of an instruction, the issue of whether an instruction is required presents a question of law for de novo review.") However, because Appellant failed to request an instruction on reckless homicide, we review Appellant's

argument hereunder a "plain-error" standard of review. Notice of plain error

under Crim.R. 52(B) is to be taken with the utmost of caution, under

exceptional circumstances and only to prevent a manifest miscarriage of

justice. *State v. Grube,* ¶ 34; *See, e.g., State v. Barnes,* 94 Ohio St.3d 21, 27,

759 N.E.2d 1240 (2002); *State v. Hill,* 92 Ohio St.3d 191, 196, 749 N.E.2d

274 (2001). Plain error should not be invoked unless it can be said that, but

for the error, the outcome of the trial would clearly have been otherwise.

*See, e.g., State v. Jackson*, 92 Ohio St.3d 436, 438, 751 N.E.2d 946 (2001);

*State v. Sanders,* 92 Ohio St.3d 245, 263, 750 N.E.2d 90 (2001).

## LEGAL ANALYSIS

1. Did the trial court commit plain error by failing to give a lesser included instruction on reckless homicide?
2. Did Appellant's counsel render ineffective assistance by failing to request the lesser included offense instruction of reckless homicide?

{¶110} The question of whether a particular offense should be

submitted to the finder of fact as a lesser-included offense involves a two-

tiered analysis. *State v. Deanda*, 136 Ohio St.3d 118, 2013-Ohio-1722, 989

N.E.2d 986, at ¶ 6;[9] *State v. Evans,* 122 Ohio St.3d 381, 2009-Ohio-2974,

911 N.E.2d 889, ¶ 13. *State v. Wilson,* 4th Dist. Scioto No. 13CA3542,

2015-Ohio-2016, at ¶ 42. The first tier, also called the "statutory-elements

---

[9] *Deanda* provides a comprehensive historical review of the lesser-offenses analysis.

step," is a purely legal question, wherein we determine whether one offense

is generally a lesser-included offense of the charged offense. *State v. Kidder,*

32 Ohio St.3d 279, 281, 513 N.E.2d 311 (1987). The second tier looks to

the evidence in a particular case and determines whether " 'a jury could

reasonably find the defendant not guilty of the charged offense, but could

convict the defendant of the lesser-included offense.' " *Evans* at ¶ 13,

quoting *Shaker Hts. v. Mosely,* 113 Ohio St.3d 329, 2007-Ohio-2072, 865

N.E.2d 859, ¶ 11.

{¶111} In *State v. Deem,* 40 Ohio St.3d 205, 533 N.E.2d 294 (1988),

paragraph three of the syllabus, the Supreme Court of Ohio held:

> "An offense may be a lesser-included offense of another if (i)
> the offense carries a lesser penalty than the other; (ii) the
> greater offense cannot, as statutorily defined, ever be committed
> without the lesser offense, as statutorily defined, also being
> committed; and (iii) some element of the greater offense is not
> required to prove the commission of the lesser offense."

{¶112} The *Deem* statement of the rule remained the norm in Ohio for

20 years, until it was further reworded in *Evans, supra*; *Deanda, supra,* at

¶ 13. In *Deanda, supra,* the Supreme Court of Ohio explained:

> "[T]he test does not require identical language to define the two
> offenses, but focuses upon whether the words used in the statute
> defining the greater offense will put the offender on notice that
> an indictment for that offense could also result in the
> prosecution of the lesser-included offense. *Evans* at ¶ 22. Thus,
> in order 'to ensure that such implausible scenarios will not
> derail a proper lesser included offense analysis' in the future,

we made one minor change in the phrasing of the second step of the statutory-elements test stated in Deem, by deleting the word 'ever.' *Id.* at ¶ 25. The second step now requires that 'the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed.' Id. at paragraph two of the syllabus."

{¶113} With this framework in mind, we now consider whether the trial court should have given the jury a reckless homicide instruction as a lesser-included offense of involuntary manslaughter. Our research has yielded little guidance on whether, as a general premise, reckless homicide is a lesser-included offense of involuntary manslaughter. Other appellate districts have reached differing conclusions.

{¶114} In *State v. Hipshire,* 2nd Dist. Darke No. 2010-CA-07, 2011-Ohio-3863, the defendant contended that the trial court erred in refusing to instruct the jury on the lesser-included offense of reckless homicide. The trial court instructed the jury on the elements of involuntary manslaughter, but stated that it could find nothing to indicate that reckless homicide was a lesser-included offense in terms of statutory interpretation or common law decision. As in Appellant's case herein, Hipshire was convicted of having violated R.C. 2903.04(A), involuntary manslaughter, which does not specify a culpable mental state, but the mental state "is supplied by the underlying offense." *Id.* at ¶ 28. *See also State v. Carusone,* 1st Dist. Hamilton No. C–010681, 2003–Ohio–1018, ¶ 47.

{¶115} In *Hipshire,* the underlying felony offense for which Hipshire was indicted was a violation of R.C. 2903.16(A), failing to provide for a functionally impaired person, which required proof of the mental state of "knowingly." The appellate court held:

> "Although Hipshire should have been more attentive to his wife's condition, there is evidence that she was not malnourished, that she did receive food and medication, and that some degree of care was given. A jury could reasonably conclude that Hipshire showed heedless indifference to the consequences and perversely disregarded a known risk that his conduct was likely to result in his wife's death, thus meriting the Reckless Homicide instruction. Accordingly, the trial court erred in refusing to instruct the jury on Reckless Homicide as a lesser-included offense."

The *Hipshire* court ultimately concluded that the trial court based its decision on incorrect legal grounds, not on factual conclusions relating to the state of the evidence.[10]

{¶116} In *Carusone, supra,* the appellate court considered the culpable mental states required for involuntary manslaughter and reckless homicide and concluded that the mental states were inconsistent. However, *Carusone* is distinguishable in that Carusone was involved in an altercation with *two* victims (emphasis added). The court held at ¶ 50:

---

[10] *Hipshire* held that the court's stated reason for refusing to give the instruction was based on unsound reasoning—an error of law—and in that respect, was an abuse of discretion. *Id.* at 41. *See, e.g., AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.3d 597(1990).

"We hold, under the facts of this case, that Carusone could not have been found guilty of both involuntary manslaughter and reckless homicide. * * * The evidence did not reasonably support findings that Carusone acted both knowingly and recklessly * * *."

{¶117} In *State v. Patterson,* 11th Dist. Trumbull No. 2013-T-0062, 2015-Ohio-4423, a case similar to ours, the defendant was convicted for reckless homicide and corrupting another with drugs, along with other felonies. In a dissenting opinion, Justice Wright opined at ¶ 117:

"Involuntary manslaughter can be committed without reckless homicide also being committed."

{¶118} Assuming, as in Hipshire, there are occasions where reckless homicide may fairly be considered a lesser-included offense of involuntary manslaughter, here, we do not find the trial court's failure to give a lesser-included instruction was in error, let alone plain error. At trial, the defense theory of the case was that there was an absence of evidence that Appellant trafficked in drugs. Appellant's involuntary manslaughter conviction is contingent only upon proof of the underlying felony trafficking. Defense counsel pointed out in closing that there was only circumstantial evidence of texting between Tyler Miller's phone and "whomever" was using Appellant's phone. Defense counsel emphasized Appellant's lack of a criminal record. Defense counsel's closing argument emphasized that Appellant's friend, Cory Forshey, had access to Appellant's cell phone, thus

attempting to plant the idea that Corey Forshey was the one trafficking in drugs the night Tyler Miller overdosed.

{¶119}  It appears defense counsel's strategy was "all or nothing," to argue for a complete acquittal of both charges.  It would have been inconsistent for Appellant's counsel to argue for complete acquittal while at the same time, attempt to argue that Appellant "knew of a dangerous situation," yet "failed to use ordinary care" as set forth above in the definition of "recklessness."  Generally, a failure to request a jury instruction on a lesser-included offense is presumed to be a matter of trial strategy. *Wilson, supra,* at ¶ 42.  In this case, that Appellant's trial counsel employed this "all-or-nothing" strategy is a reasonable presumption.

{¶120} For the foregoing reasons, we find no plain error with regard to the trial court's failure to give a lesser-included offense jury instruction. Related to the above argument, Appellant has also asserted he received ineffective assistance of counsel due to his attorney's failure to request a lesser-included offense instruction.  Given our finding that Appellant did not request the instruction as a matter of reasonable trial strategy, similarly, we find Appellant was not rendered the ineffective assistance of counsel with regard to the lack of request for this instruction.

{¶121} Criminal defendants have a right to counsel, including a right to the effective assistance from counsel. *State v. Hill,* 4th Dist. Athens No. 16CA3, 2018-Ohio-67, at ¶ 41. *McMann v. Richardson*, 397 U.S. 759, 770, 90 S.Ct. 1441 (1970); *State v. Stout,* 4th Dist. Gallia No. 07CA5, 2008-Ohio-1366, at ¶ 21. To establish constitutionally ineffective assistance of counsel, a defendant must show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived him of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052 (1984); *State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Goff,* 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998). "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95 (citations omitted). "Failure to establish either element is fatal to the claim." *State v. Jones,* 4th Dist. Scioto No. 06CA3116, 2008-Ohio-968, ¶ 14, 2008 WL 613116. Therefore, if one element is dispositive, a court need not analyze both. *State v. Madrigal,* 87 Ohio St.3d 378, 389, 2000-

Ohio-448, 721 N.E.2d 52, (stating that a defendant's failure to satisfy one of the elements "negates a court's need to consider the other").

{¶122} When considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Hill, supra,* at ¶ 42, quoting *Strickland* at 689, 104 S.Ct. 2052. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* "A properly licensed attorney is presumed to execute his duties in an ethical and competent manner." *State v. Taylor,* 4th Dist. Washington No. 07CA11, 2008-Ohio-482, ¶ 10, quoting *State v. Smith,* 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985).

{¶123} As cited above, "[T]actical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance of counsel." *State v. Rizer,* 4th Dist. Meigs No. 10CA3, 2011-Ohio-5702, at ¶ 37, quoting *In re Wingo*, 143 Ohio App.3d 652, 668, 2001–Ohio–2477, 758 N.E.2d 780, (4th Dist.), citing *State v. Carter,* 72 Ohio St.3d 545, 558, 1995–Ohio–104, 651 N.E.2d 965. The underlying conviction, trafficking in drugs, was supported by circumstantial evidence which defense counsel vigorously challenged. As such, we view counsel's decision not to request

the lesser-included instruction on reckless homicide to be a reasonable trial strategy and we do not find it to be deficient representation.

{¶124} For the foregoing reasons, we find no merit to Appellant's fourth assignment of error.  It is hereby overruled.  And, we affirm the decision of the trial court.

**JUDGMENT AFFIRMED.**

# JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hoover, P.J. & Harsha, J.: Concur in Judgment and Opinion.

For the Court,


BY:  _____
Matthew W. McFarland, Judge


**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**