[Cite as *State v. Williams*, 2020-Ohio-4430.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

RUBIN L. WILLIAMS,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 19 CO 0010**

---

Criminal Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2018-CR-155

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Robert Herron*, Prosecutor, *Atty. John E. Gamble*, Chief Assistant Prosecutor, *Atty. Tammie Riley Jones,* Assistant Prosecutor, 105 South Market Street, Lisbon, Ohio 44432, for Plaintiff-Appellee and

*Atty. Edward A. Czopur*, DeGenova & Yarwood, Ltd., 42 North Phelps St. Youngstown, Ohio 44503 for Defendant-Appellant.

**Dated:  August 21, 2020**

---

**Robb, J.**

{¶1}  Defendant-Appellant Rubin Williams appeals after being convicted in the Columbiana County Common Pleas Court of involuntary manslaughter and drug trafficking.  Appellant contests the sufficiency of the evidence on the causation element of involuntary manslaughter.  He says the contributing role played by the fentanyl he allegedly provided to the decedent did not establish his drug trafficking was the actual cause of her overdose death due to the mix of drugs in her system.  He relies on the United States Supreme Court's *Burrage* case, while the state urges the case is distinguishable.  Legal cause is also raised, which invokes a foreseeability evaluation.  Appellant additionally challenges the weight of the evidence, stating the jury clearly lost its way on causation.  For the following reasons, the trial court's judgment is affirmed.

<u>STATEMENT OF THE CASE</u>

{¶2}  On May 17, 2018, Appellant was indicted for involuntary manslaughter for causing the death of Jennifer Bettis as a proximate result of committing or attempting to commit a felony (drug trafficking).  *See* R.C. 2903.04(A).  Appellant was also indicted for knowingly selling or offering to sell a controlled substance, specified as fentanyl (a Schedule II controlled substance).  *See* R.C. 2925.03(A)(1).  The testimony indicated that Appellant's drug runner was to deliver to the decedent $40 worth of heroin (a Schedule I controlled substance).  Instead, the decedent received a pink substance containing fentanyl, and she died after injecting it.

{¶3}  The case was tried to a jury.  The decedent's friend testified that she allowed the decedent to move into her apartment in Salem (to sleep on her couch) some weeks before the death.  The friend was unaware of the decedent's drug use.  (Tr. 230).  On October 14, 2016, she left her one-year-old child with the decedent in the afternoon, without anticipating being gone overnight.  (Tr. 231, 245).  While she was out, she called and texted the decedent multiple times with no response.  (Tr. 233, 249).  She did not return to her home until nearly 6:00 a.m. on October 15, 2016.  (Tr. 233).  She found the decedent's body in a chair at the kitchen table.  On the table was an uncapped syringe,

a spoon with residue, a folded paper packet containing a pink substance, a lighter, and other drug paraphernalia. (Tr. 237, 280-281, 284). A baby gate impeded the entrance to the kitchen, and the child was found sleeping on the floor by the gate. (Tr. 248).

**{¶4}** A Salem police officer testified that he was dispatched at 5:57 a.m. to the apartment near the police station after a frantic call was made to 911. He observed there were no signs of forced entry or a struggle, pointing out how the decedent was still sitting in a kitchen chair with her left leg crossed over her right leg and her head back. (Tr. 204). He said it was clear she was dead because blood was already pooling behind her skin in lower spots. (Tr. 211). The detective confirmed the officer's observations. (Tr. 276-277). He also noticed track marks on the decedent's inner elbow. (Tr. 280). In addition to the drug paraphernalia on the table, the decedent's purse contained more syringes. (Tr. 280). There was vomit in the trash can near the body, and there was testimony explaining how a drug addict can be "dope sick" while awaiting drugs due to withdrawal. (Tr. 290, 392).

**{¶5}** A forensic scientist from BCI testified that the pink substance in the folded paper packet contained fentanyl. (Tr. 509). Another BCI forensic scientist testified that male DNA was present on the exterior of the packet, but it was not suitable for comparison as it was of insufficient quantity or quality. (Tr. 525). The toxicology report showed the decedent's blood contained fentanyl, benzodiazepines (anti-anxiety), dextromethorphan (cough suppressant), and gabapentin (anti-convulsant). (Tr. 454, 467, 472, 480-483).

**{¶6}** The decedent's husband testified that they had been separated for seven years and he had custody of their two children. As the decedent had no car or license, he drove to the Salem apartment on October 14, 2016 before 4:00 p.m. in order to transport her to her mother's house so she could attend a parent's day function the next day. However, she could not leave as she was babysitting. When she requested $40 for gas money to find a ride the next day, the husband went to a store to withdraw the money from an ATM and to buy her a pack of cigarettes. (Tr. 217-218). He texted the decedent a few hours after he left to provide the time for the event, but she did not respond. (Tr. 219). The decedent's husband noted that a year before her death, he picked her up after she was treated at a drug rehabilitation facility. (Tr. 222). He said she had no chronic health conditions. (Tr. 215).

Case No. 19 CO 0010

{¶7}   After the police left the apartment, the decedent's friend looked through an old cell phone which she previously let the decedent use.  The phone was logged in to the decedent's Facebook account, and the friend saw private messages about drug transactions between the decedent and a person with the profile name of "Scrooug McDuck." (Tr. 240-241).  She brought the phone to the police station but was then locked out of the decedent's Facebook account.  (Tr. 250).

{¶8}   The decedent's own phone had already been seized by the police, and they soon extracted information from it.  (Tr. 263, 346-347, 349).  By serving a search warrant on Facebook, they also obtained the decedent's Facebook Messenger conversations with Scrooug McDuck (such as the one viewed by the friend on her old phone).  (Tr. 305).  In the meantime, the detective discovered that Scrooug McDuck's Facebook profile was public and obtained his profile picture, another nickname, and a list of friends.   His girlfriend's name, Ursula Lewis, matched the name of a person present when a search warrant was executed in Boardman.   (Tr. 298-300).   After speaking to various law enforcements agencies, the detective matched Scrooug McDuck's profile picture with the photograph in the state's official records associated with Appellant Rubin Williams.  (Tr. 299-302).

{¶9}   The detective also traced a phone number used to communicate with the decedent around the time of the suspected drug delivery; it was assigned to Nicole Miladore-Mitchell, who lived at the Boardman house where the recent search warrant was executed.  (Tr. 292-294).  The detective found Nicole in jail after she was arrested for fleeing from the police and crashing a vehicle (which resulted in the death of her passenger who had been shoplifting just before the crash).  (Tr. 309, 420-421).  At trial, Nicole testified that she was serving a prison sentence for involuntary manslaughter, failure to comply, and operating a vehicle while intoxicated, all associated with the crash.  (Tr. 386).  She said Appellant was her drug dealer, and he came to stay with her (and her boyfriend) in October 2016, after Appellant got into an argument with his roommate who was also a drug dealer.  (Tr. 388, 408).  Appellant's girlfriend Ursula moved into the Boardman house as well.  Nicole received free drugs for her addiction in exchange for allowing Appellant to operate out of her house and for acting as his drug runner.  (Tr. 388-391).

**{¶10}** Nicole said Appellant used her wireless internet connection because he had a phone with no cellular service. (Tr. 393). She also let him borrow her phone in the past. (Tr. 410). She observed that Appellant often communicated with her and with his clients about drug transactions using Facebook Messenger where his profile name was Scrooug McDuck. (Tr. 394, 427). Nicole testified that she was involved in deliveries to the decedent in Salem at Appellant's instruction on the day before her body was discovered and a prior day. (Tr. 396, 413-414). On October 12, 2016, she was high on drugs while her boyfriend drove to meet the decedent in the parking lot of the Salem apartment; she said Ursula was with them in the car. (Tr. 413).

**{¶11}** On October 14, 2016, Nicole drove to the decedent's apartment alone after Appellant handed her the packet of drugs, which she believed was heroin. (Tr. 396-397, 414). She said she used her phone to contact the decedent to tell her she had arrived, and the decedent handed her $40 for the drugs. (Tr. 398-399, 414). Nicole maintained contact with Appellant on the way to the decedent's location and on the way home. (Tr. 397, 399, 428-429). Nicole turned over the $40 to Appellant when she returned to her house. (Tr. 399).

**{¶12}** Nicole revealed that the day before this delivery, she personally had a bad experience with heroin Appellant gave her. Prior to injecting it, she observed that it was pink while heroin is usually brown. She injected the substance in the presence of her boyfriend, Ursula, and Appellant, and they later informed her that they feared she was overdosing. (Tr. 400). Later, when Appellant learned of the death, he expressed his concern to Nicole because the decedent overdosed on the drugs he provided. (Tr. 401).

**{¶13}** The coroner explained that due to the increase in drug overdose deaths, the forensic pathologist in Cuyahoga County informed the various counties serviced by that office that autopsies for overdoses would no longer be performed without a written statement explaining the need. (Tr. 462-463). The coroner testified that the decedent's death would not have occurred in the absence of the fentanyl. (Tr. 493). His testimony is further detailed below in addressing the assignments of error.

**{¶14}** After Appellant moved for acquittal, he testified in his own defense and presented the testimony of his former girlfriend. Appellant testified that he began selling drugs to the decedent in early 2016 but claimed he was not still selling to her in October

of that year. (Tr. 574-575). He said he sold heroin and crack but did not sell fentanyl as people were not using it yet. (Tr. 585). He claimed his roommate, who was his supplier, evicted him around October 11, 2016 and took his drug cache. (Tr. 576, 578, 586). Appellant said after he moved into Nicole's house, Nicole supplied drugs to the decedent, not him. (Tr. 574-575). He said he used Nicole's phone and logged in to Facebook but forgot to log out when he gave the phone back to her, which gave her access to his Facebook account. (Tr. 581-582). He denied speaking to the decedent through his Facebook account on October 14, 2016. (TR. 582). His criminal history was discussed. He did not use the drugs he sold (besides marijuana and some pills), but he noted that his girlfriend and other users tested his product supply. (Tr. 595-596).

**{¶15}** Ursula testified that when Appellant's roommate cut off his drug supply in October 2016, Appellant no longer had drugs to sell and lacked a supplier. She claimed that Nicole and her boyfriend would pick up drugs from somewhere on the east side of Youngstown as they had a car. (Tr. 549-550, 553). Still, Appellant continued to arrange drug sales through Facebook Messenger. (Tr. 559-560). Ursula knew Nicole brought drugs to the decedent shortly before her death because Appellant (and Nicole) told her. (Tr. 554). Ursula admitted that after Nicole and her boyfriend would retrieve and deliver the drugs, they all would split the "profit" (she would snort it and they would inject it). (Tr. 556). Ursula acknowledged her criminal and drug history.

**{¶16}** The jury found Appellant guilty as charged. The court sentenced Appellant to eleven years for involuntary manslaughter. On agreement of the parties, the drug trafficking offense was merged into the greater offense. Appellant filed a timely notice of appeal from the March 7, 2019 sentencing entry. He then filed motions for a new trial and acquittal. As the trial court opined that it could not rule on the motions pending appeal, this court issued a limited remand order. After the trial court denied the motions, the appeal was reactivated.

ASSIGNMENT OF ERROR ONE: SUFFICIENCY/CAUSATION

**{¶17}** Appellant's first assignment of error provides:

"The trial court erred in denying Appellant's motion for acquittal as there was insufficient evidence to support a conviction for involuntary manslaughter."

**{¶18}** The standard for reviewing the sufficiency of the evidence to support a criminal conviction on appeal is the same as the standard used to review the denial of a motion for acquittal. *See, e.g.,* Crim.R. 29(A) (referring to insufficient evidence), (C) (post-verdict motion for acquittal); *State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996). Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). An evaluation of witness credibility is not involved in a sufficiency review as the question is whether the evidence is sufficient if believed. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring).

**{¶19}** "A conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991). Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001).

**{¶20}** A conviction cannot be reversed on the grounds of insufficient evidence unless the reviewing court determines that no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). In conducting this review, all of the evidence is to be viewed in light most favorable to the prosecution. *Id.* Reasonable inferences to be drawn from the evidence are also evaluated in the light most favorable to the state. *See State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999). *See also Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (pointing to reasonable inferences about both basic and ultimate facts in evaluating the due process requirement of sufficient evidence). The question is merely whether "*any* rational trier of fact" could have found the essential elements proven beyond a reasonable doubt. (Emphasis original.) *See State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998).

**{¶21}** First-degree felony involuntary manslaughter has the relevant following elements: "cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A), (C). Here, the felony was

drug trafficking, and Appellant was additionally charged with knowingly selling or offering to sell a schedule II controlled substance. Fentanyl is a schedule II controlled substance.

**{¶22}** The state presented the messages between Appellant's Facebook Messenger account and the decedent arranging the drug sale. The jury heard Nicole testify that Appellant was her drug dealer, she was his drug runner, and she let him "trap" (sell drugs) out of her house. He instructed her to deliver drugs to the decedent and handed her the folded packet of fentanyl which she believed was heroin. Appellant also kept in contact with his drug runner before and after the delivery and received the $40 from Nicole when she returned to her house. Nicole nearly overdosed on a pink substance in front of Appellant the day before the delivery to the decedent; she noted heroin is usually brown. The police noticed a pink residue on the spoon used to prepare the drugs for injection and recovered a pink substance from the folded packet which was on the kitchen table in front of the decedent's body. Forensic testing showed the pink substance was fentanyl. The testimony presented by Appellant and his girlfriend contested some of Nicole's testimony, but this was a consideration for the jury in determining the weight of the evidence, as discussed in the second assignment of error. From the direct and circumstantial evidence presented at the trial, a rational juror could conclude that Appellant sold the fentanyl which was injected by the decedent.

**{¶23}** In any event, Appellant's specific argument takes issue with the causation element of involuntary manslaughter. He contends the state failed to prove that his conduct of supplying the fentanyl was the actual or legal cause of the decedent's death. He relies on the United States Supreme Court's *Burrage* case and the Fifth District's application of *Burrage* to reverse a conviction for involuntary manslaughter in *Kosto*, a case involving a mixed drug overdose.

**{¶24}** In *Burrage*, the defendant was federally indicted for unlawfully distributing heroin with an additional sentencing enhancement element applying to cases where "death * * * results from the use of such substance." *Burrage v. United States*, 571 U.S. 204, 206-209, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014), citing 21 U.S.C. 841(b)(1)(C) (mandatory minimum of 20 years, maximum of life). The additional element was an issue for the trier of fact and had to be proven beyond a reasonable doubt. *Burrage*, 571 U.S. at 210. In the *Burrage* case, the decedent's blood contained multiple drugs in addition to

heroin metabolites, including codeine, alprazolam, clonazepam metabolites, and oxycodone. *Id.* at 207. The two experts who testified "could not say whether [the decedent] would have lived had he not taken the heroin." *Id.* One expert said heroin "was a contributing factor" in the death as it interacted with the other drugs to cause respiratory and/or central nervous system depression; the other expert testified similarly and described the cause of death as "mixed drug intoxication" with heroin, oxycodone, alprazolam, and clonazepam all playing a "contributing" role, adding only that the death would have been "[v]ery less likely" without the heroin. *Id.*

**{¶25}** After a jury convicted the defendant and the circuit court affirmed, the United States Supreme Court granted certiorari on two issues: "Whether the defendant may be convicted under the 'death results' provision (1) when the use of the controlled substance was a "contributing cause" of the death, and (2) without separately instructing the jury that it must decide whether the death by drug overdose was a foreseeable result of the defendant's drug-trafficking offense." *Id.* at 208.

**{¶26}** The *Burrage* Court first outlined the two parts of the causation element in a criminal case: actual cause and legal cause. *Id.* at 210. In general, when a crime requires both conduct and a specific result of the conduct, a defendant's conduct must be both the actual cause and the legal cause of the result. *Id.* The Court specified that it was only reaching the issue of actual cause. *Id.* On the topic of legal cause, the Court said legal cause is also called proximate cause and noted that the two issues accepted for review corresponded to the two parts of causation (meaning legal cause involves foreseeability). *Id.* at 208, 210.

**{¶27}** On the topic of actual cause, the state argued the "death results" language of the statute is satisfied if the substance sold was a "contributing factor" or a "substantial factor" such as when the drug sold was one of the drugs involved in a mixed drug overdose death. *Id.* at 214-215. The Court rejected this argument, stating the lower courts would be left to guess how substantial a cause must be to qualify and noting Congress could have written the statute to impose a mandatory minimum when the underlying crime "contributes to" death. *Id.* at 216, 218.

**{¶28}** The Court defined the element "death results" as requiring but-for causation so that the state was required to prove that the decedent would not have died but for the

defendant's conduct.  *Id.* at 211-212 (noting that but-for causation would not be required if a statute contains "textual or contextual indication to the contrary").  In other words, the prosecution must submit "proof that 'the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct."  *Id.* at 211.

**{¶29}** The Court first gave the simple example of a defendant shooting a victim who dies from the gunshot, stating the defendant actually caused the death because but for the conduct, the decedent would not have died.  *Id.*  Notably:  "The same conclusion follows if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back."  *Id.*

**{¶30}** The Court explained that if a defendant poisons a man debilitated by multiple diseases, the poison is a but-for cause of his death even if the diseases played a part in his death "so long as, without the incremental effect of the poison, he would have lived."  *Id.*  The Court admonished that "but-for causation is not nearly the insuperable barrier the Government makes it out to be" and cited two examples where an expert testified that the drug distributed by the defendant was a but-for cause of death even though the decedent's blood contained several drugs.  *Id.* at 217.

**{¶31}** As for a cited example of relaxed but-for causation, the Court pointed out that it was *not* faced with the type of case where the drug was said to be an independent cause of death, such as where two strangers each inflict a fatal wound on a victim at the same moment.  *Burrage,* 571 U.S. at 214-215.  In such case, the defendant's conduct can still be an independent cause even though his conduct was not the but-for cause of death since the victim would have died anyway.  *Id.*

**{¶32}** The Court concluded:  "We hold that, at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury."  *Id.* at 218-219.  As the government conceded that there was no evidence the decedent "would have lived but for his heroin use," the Court reversed the defendant's conviction under the penalty enhancement and remanded.  *Id.* at 219.

**{¶33}** First, we note that *Burrage* was an appeal from a federal conviction where the non-constitutional issue involved the interpretation of language in a federal statute. It is therefore not binding on a state court's interpretation of the state's own statutes. *See, e.g., United States v. Thirty-Seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) ("we lack jurisdiction authoritatively to construe state legislation"); *State v. Phillips*, 27 Ohio St.2d 294, 298, 272 N.E.2d 347 (1971) (the reversal of a conviction under a federal statute, which is unrelated to constitutional grounds that dictate the course of state law, may be persuasive authority but is not binding on a state court).

**{¶34}** Second, the *Burrage* Court noted that a strict but-for test of causation would not be applied if a statute contained a "textual or contextual indication to the contrary." *Id.* at 212. Subsequently, the Court found such a textual or contextual indication against but-for causation where a federal statute limited restitution to losses that are the "proximate result" of the defendant's offense. *Paroline v. United States*, 572 U.S. 434, 458, 134 S.Ct. 1710, 188 L.Ed.2d 714 (2014) (noting *Burrage* mentioned that some statutes may have indicators against the but-for test). "[S]uch unelaborated causal language by no means requires but-for causation by its terms." *Id.* (and indicating the contributing role of the defendant in the victim's loss due to child pornography should be considered in determining restitution).

**{¶35}** The statute in the case before us requires the defendant to "cause the death of another * * * as a proximate result" of committing or attempting to commit a felony. R.C. 2903.04(A)(1). Ohio courts regularly conclude the "proximate result" language in the involuntary manslaughter statute requires the state to show: (1) actual cause, generally through the but-for test; and then, (2) legal cause, through the foreseeability test. *See State v. Mitchell*, 3rd Dist. Union No. 14-19-14, 2019-Ohio-5168, ¶ 23 (but there can be more than one cause); *State v. Potee*, 12th Dist. No. CA2016-06-045, 2017-Ohio-2926, 90 N.E.3d 58, ¶ 33. Ohio's standard jury instruction (provided in this case) first defines cause as "an act or failure to act which in a natural and continuous sequence directly produces the death of another, and without which it would not have occurred"; it then explains that natural consequences include the foreseeable consequences that follow in the ordinary course of events. O.J.I., Crim. Section 417.23 (2019). The language, "without which it would not have occurred," encapsulates but-for causation.

**{¶36}** Similarly, this court has reviewed a felony-murder conviction under a statute with the same "cause the death of another * * * as a proximate result of" language. *State v. Franklin*, 7th Dist. Mahoning No. 06-MA-79, 2008-Ohio-2264, ¶ 18, quoting R.C. 2903.02(B). We held: "In order for a criminal defendant's conduct to be the proximate cause of a fatal result in a felony murder case, the court must first determine whether the killings would not have occurred 'but for' the defendant's conduct. The court must then determine whether the result varied greatly from the intended outcome or foreseeable result of the underlying crime * * *." *Franklin*, 7th Dist. No. 06-MA-79 at ¶ 120-121, quoting *State v. Franklin*, 10th Dist. Franklin No. 06AP-1154, 2008-Ohio-462, ¶ 25.

**{¶37}** The but-for test of causation is the standard test for establishing cause in fact. *Ackison v. Anchor Packing Co.*, 120 Ohio St.3d 228, 2008-Ohio-5243, 897 N.E.2d 1118, ¶ 48. A substantial factor can be used in civil cases where a plaintiff suffers a single injury as a result of the tortious acts of multiple defendants. *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990). In criminal cases involving the involuntary manslaughter statute and a mixed drug overdose, some Ohio appellate courts have expressed that, contrary to *Burrage*, a substantial factor test can be applied. *See State v. Price*, 8th Dist. No. 107096, 2019-Ohio-1642, 135 N.E.3d 1093, ¶ 42; *State v. Carpenter*, 3rd Dist. No. 13-18-16, 2019-Ohio-58, 128 N.E.3d 857, ¶ 51-52 ("there are circumstances under which the "but for" test is inapplicable and an act or omission can be considered a cause in fact if it was a "substantial" or "contributing" factor in producing the result"). *See also State v. Hall*, 12th Dist. Preble No. CA2015-11-022, 2017-Ohio-879, ¶ 71-74. Nevertheless, the *Price* case still suggested but-for causation was satisfied. *Price*, 8th Dist. No. 107096 at ¶ 42-43 (finding the trial court instructed the jury on but-for causation).[1]

**{¶38}** These cases rejected the holding in *Kosto* where the Fifth District found the evidence was insufficient to show the heroin supplied by the defendant caused the victim's death under the involuntary manslaughter statute after attempting to apply but-

---

[1] A discretionary appeal is pending in the Ohio Supreme Court on a proposition related to the involuntary manslaughter count asking whether the jury must be instructed that the drug supplied by the defendant "was an independent cause of death and that, but for the ingestion of those drugs, the user would not have died." *State v. Price*, 157 Ohio St.3d 1418, 2019-Ohio-3797, 131 N.E.3d 961. Also, a conflict was certified with *Kosto* on the issue of whether the *Burrage* rationale on but-for causality applies to the causation element in the offense of corrupting another with drugs. *State v. Price*, 157 Ohio St.3d 1417, 2019-Ohio-3797, 131 N.E.3d 952.

for causation under the *Burrage* rationale. *State v. Kosto*, 5th Dist. Licking No. 17 CA 54, 2018-Ohio-1925, ¶ 24-25.[2] The *Kosto* court concluded: "just as in *Burrage*, 'no expert was prepared to say that the victim would have died from the heroin use alone.'" *Id.* at ¶ 23, quoting *Burrage*, 571 U.S. at 890.

**{¶39}** However, this is a misinterpretation of *Burrage*. That statement in *Burrage* was explaining why the independent cause test was not at issue in that case; the statement was not defining but-for causation (an issue which the Court framed as asking whether the death would not have occurred without the drug supplied by the defendant). Specifically, this excerpt on "heroin use alone" is modified by:

> * * *courts have not always required strict but-for causality, even where criminal liability is at issue. The most common (though still rare) instance of this occurs when multiple sufficient causes independently, but concurrently, produce a result. * * * To illustrate, if "A stabs B, inflicting a fatal wound; while at the same moment X, acting independently, shoots B in the head ... also inflicting [a fatal] wound; and B dies from the combined effects of the two wounds," A will generally be liable for homicide *even though his conduct was not a but-for cause* of B's death (since B would have died from X's actions in any event). * * * *We need not accept or reject the special rule developed for these cases*, since there was no evidence here that Banka's heroin use was an independently sufficient cause of his death. No expert was prepared to say that Banka would have died from the heroin use alone.

(Emphasis added). *Burrage*, 571 U.S. at 890.

**{¶40}** Likewise, Appellant believes *Burrage* means that the testimony must show the decedent would have died from the drug he provided alone. However, the independent cause test is not the same as but-for causation. The Court's conclusion of law specifically stated: *if* the situation does not satisfy the independent cause test, *then* but-for causation would apply. *Burrage*, 571 U.S. at 218-219. This was after pointing out

---

[2] *Kosto* used the same rationale to reverse the defendant's conviction for corrupting another with drugs under R.C. 2925.02(A)(3), which states: "[n]o person shall knowingly * * * administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person." That statute does not contain the "proximately results" language of the involuntary manslaughter statute.

that the independent cause test was not before the Court. *Id.* at 215 (as there was no testimony that the decedent would have died from heroin alone). Therefore, in applying the but-for test to actual cause, the United States Supreme Court did not require the prosecution to show the drug supplied would have killed the decedent if there were no other drugs in her system.

**{¶41}** Rather, the Court expressly said but-for causation required the prosecution to show the decedent would have survived if not for the drug the defendant supplied. *Id.* at 219. The fact that there was a mixed drug overdose but the defendant only supplied one drug is not dispositive. *See id.* at 211 (pointing to the straw that broke the camel's back), 216 (but-for causation would be satisfied by the presentation of testimony stating that even though multiple drugs were in the decedent's system, he would not have died without the addition of the drug at issue).

**{¶42}** Our case is distinguishable from the Supreme Court's *Burrage* case as the testimony in the case at bar indicated that the decedent believed she was receiving and injecting heroin, not fentanyl. The coroner explained that a quarter of an inch of heroin in a vial compares to a mere two drops of fentanyl. (Tr. 495). A rational person could find the state showed fentanyl was an independent cause of death (which would have occurred even if she had no other drugs in her system) as the evidence shows the decedent took a "lethal dose" of fentanyl thinking it was heroin. (Tr. 469, 489, 494).

**{¶43}** Regardless, our case is distinguishable from the non-binding *Burrage* case as the state established that fentanyl was the but-for cause of death. The coroner specifically testified that the decedent ingested a lethal dose of fentanyl and she would not have died if she had not used the fentanyl. (Tr. 493-494). If the state showed the fentanyl provided by Appellant was the but-for cause of the decedent's death, then: the application of *Burrage's* but-for causation rationale would not assist Appellant; *Kosto* is distinguishable; and there is no need to consider a substantial factor test.

**{¶44}** Here, the coroner testified to a reasonable degree of medical certainty that the decedent's cause of death was asphyxia and drug overdose. (Tr. 473). The death certificate reported: the immediate cause of death was asphyxia, a condition leading to the cause was mixed drug overdose, and the injury occurred when the decedent took a lethal dose of drugs. (Tr. 485); (Def.Ex. C). Appellant emphasizes the reporting of a

mixed drug overdose, the ability of the anti-anxiety drug to suppress respiration if overused, and the testimony that a person can build a tolerance to heroin and even to fentanyl. (Tr. 470). However, there was no indication that the decedent ordered fentanyl, while there was an indication that she ordered heroin.

**{¶45}** Appellant suggests that to ensure a fact-finder can rely on the coroner's individual opinions, the coroner must continue to repeat that his opinions were to a "reasonable degree of scientific certainty" rather than preface his opinion with phrases such as, "I know" (when utilizing information disclosed by investigators to formulate his conclusions).[3] In response to an argument on the failure to modify an opinion by "reasonable degree of scientific certainty" language, the Supreme Court has pointed out that Evid.R. 702 requires that an expert's testimony be based on "reliable" scientific, technical, or other specialized information. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 72 (and an objection must be made to preserve an evidentiary argument). Appellant suggests that without the repetition of the modifying phrase for subsequent pieces of testimony provided by the coroner, we are not permitted to utilize his testimony that the decedent would not have died if she had not used the fentanyl in our evaluation of the sufficiency or the weight of the evidence.

**{¶46}** Yet, the *Lang* Court held that an expert witness in a criminal cases can testify in terms of possibility rather than in terms of a reasonable scientific certainty or probability, and the treatment of such testimony is analyzed under a sufficiency and weight argument, meaning that it is considered along with all of the other evidence. *Id.* at ¶ 77-78, citing *State v. D'Ambrosio*, 67 Ohio St.3d 185, 191, 616 N.E.2d 909 (1993) ("While several decisions from this court indicate that speculative opinions by medical experts are inadmissible since they are based on possibilities and not probabilities, * * * the better practice, especially in criminal cases, is to let experts testify in terms of possibility."). *See also State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 129 (In the criminal context, questions about certainty go not to

---

[3] Appellant seems to place some arguments in the factual section of the brief where he seems to take issue with the coroner's statement that it was "reasonable to assume" the decedent overdosed on drugs based on the circumstances and the drug paraphernalia. (Tr. 464). Yet, this was in the context of the coroner explaining why an autopsy was not performed; the Cuyahoga County Medical Examiner was overwhelmed and could no longer perform autopsies for drug overdoses without a showing of need. Moreover, toxicology was then ordered which confirmed the initial reasoning.

admissibility but to sufficiency of the evidence; they are matters of weight for the jury."). Moreover, the *Burrage* holding was not about whether an expert used the phrase "reasonable degree of scientific certainty" but was about the lack of an opinion that the decedent would still be alive if not for the drug at issue. And again, the evidence in our case leads a reasonable person to believe the decedent died because she received fentanyl instead of the heroin she ordered.

**{¶47}** In considering all of the circumstances, there are various background facts which are relevant to the consideration of actual cause, including: the decedent's age (30) and lack of known health conditions; her prior request for heroin (and crack) for the earlier delivery; the timing of the texts showing the delivery time; the content of an undelivered text about the product she injected; the drug runner experience with the pink product; the position of the body in a chair at the kitchen table; the baby's presence on the other side of the gate; and the uncapped syringe and packet of fentanyl remaining on the kitchen table near a spoon (used for preparing the injection and still containing residue) and a hairband (likely used as a tourniquet). These facts suggest that fentanyl was the final controlled substance ingested and was not anticipated by the decedent to be fentanyl.

**{¶48}** Furthermore, the coroner explained the other drugs in the decedent's system and compared them to fentanyl. First, the toxicology report was introduced, which showed the decedent's blood contained: fentanyl; benzodiazepine (anti-anxiety), dextromethorphan (cough suppressant), and gabapentin (anti-convulsant). (Tr. 454, 467, 472, 480-483). The anti-convulsant was well within the therapeutic range; it is often prescribed to alleviate pain, and the decedent's medical records indicated a history of migraines. (Tr. 471-472, 482). The lab did not report the therapeutic ranges for the cough medicine or the anti-anxiety drug. The cough suppressant was a Schedule V controlled substance which was previously available over-the-counter. (Tr. 483). The coroner acknowledged the anti-anxiety drug can suppress breathing but suggested a lethal dose is uncommon and emphasized that it was a Schedule IV controlled substance with less risk of addiction and overdose than fentanyl. (Tr. 481, 497).

**{¶49}** As to fentanyl, the report showed the amount in the decedent's system was nine nanograms per milliliter and listed the therapeutic range at one to three. The coroner

Case No. 19 CO 0010

was an internal medicine specialist at various local hospitals and graduated from a college of pharmacy before attending medical school. (Tr. 457-459). He opined the therapeutic range for fentanyl was only one to two nanograms per milliliter, according to the authorities he relies upon; he noted it was commonly applied topically through a patch for severe cancer and end of life pain. (Tr. 468, 470, 486). He described how fentanyl paralyzes the muscles of the chest wall and suppresses respiration causing a person to suffocate. (Tr. 468, 471). He opined the decedent originally had a higher level of fentanyl in her system than the test showed because fentanyl is metabolized into norfentanyl, which is metabolized by the liver instantaneously and not measured by the test. (Tr. 468).

**{¶50}** The coroner concluded the dose of fentanyl in the decedent's system was lethal and she would still be alive but for taking the fentanyl. (Tr. 493). From all of this, a rational person could find beyond a reasonable doubt that the fentanyl was the actual cause (or cause-in-fact) of the decedent's death.

**{¶51}** Appellant does not then alternatively discuss foreseeability, but he did begin by generally arguing that the state failed to prove his conduct was "either the actual or legal cause of [the decedent's] death." (Apt.Br. 7). "Cause in fact is distinct from proximate, or legal cause." *Renfrow v. Norfolk S. Ry. Co.*, 140 Ohio St.3d 371, 2014-Ohio-3666, 18 N.E.3d 1173, ¶ 20. After cause in fact is established, proximate cause must be demonstrated. *Id. See also Burrage*, 571 U.S. at 208, 210 (legal cause is also called proximate cause and involves foreseeability).

**{¶52}** "Foreseeability should be assessed from the viewpoint of what the defendant knew or should have known in light of ordinary experience." *Franklin*, 7th Dist. No. 06-MA-79 at ¶ 120, quoting *Franklin*, 10th Dist. No. 06AP-1154 at ¶ 25. *Mitchell*, 3rd Dist. No. 14-19-14 at ¶ 24 (the defendant is responsible for the foreseeable consequences that are known or should be known to be within the scope of risk created by his conduct); *State v. Losey*, 23 Ohio App.3d 93, 95, 491 N.E.2d 379 (10th Dist.1985). Here, the result did not vary greatly from the foreseeable result of the underlying crime as the result was not so surprising that it would be unfair to hold the defendant criminally responsible. *See Franklin*, 7th Dist. No. 06-MA-79 at ¶ 120.

**{¶53}** "The possibility of overdose is a reasonably foreseeable consequence of the sale of heroin." *State v. Patterson*, 11th Dist. Trumbull No. 2013-T-0062, 2015-Ohio-

Case No. 19 CO 0010

4423, ¶ 91. *See also Mitchell*, 3rd Dist. No. 14-19-14 at ¶ 24, 31; *State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶ 56; *State v. Vogt*, 4th Dist. Washington No. 17CA17, 2018-Ohio-4457, ¶ 99-100, 105; *State v. Veley*, 6th Dist. Lucas No. L-16-1038, 2017-Ohio-9064, ¶ 25. Death is even more foreseeable when the drug supplied is fentanyl. Furthermore, there were additional pertinent facts presented on this topic, including: Appellant's experience as the decedent's dealer; the near overdose experienced by Appellant's drug runner in his presence the day before Appellant sold the fentanyl to the decedent; the pink color of the substance the drug runner injected, when heroin was usually brown; and the pink color of the substance supplied by Appellant to the decedent which she injected. Accordingly, there was sufficient evidence to show legal causation.

{¶54} For all of the foregoing reasons, this assignment of error is overruled.

ASSIGNMENT OF ERROR TWO: MANIFEST WEIGHT

{¶55} Appellant's second assignment of error contends:

"The conviction for involuntary manslaughter was against the manifest weight of the evidence."

{¶56} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other"; it deals with the persuasive effect of the evidence in inducing belief and is not a question of mathematics. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A weight of the evidence review considers whether the state met its burden of persuasion, as opposed to the burden of production involved in a sufficiency review. *See id.* at 390 (Cook, J., concurring).

{¶57} When a defendant claims a conviction is contrary to the manifest weight of the evidence, the appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387. The appellate court's discretionary power to

grant a new trial on these grounds can be exercised only in the exceptional case where the evidence weighs heavily against the conviction. *Id.*

**{¶58}** The weight to be given the evidence is primarily for the trier of the facts. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

**{¶59}** Additionally, in a case tried by a jury, only a unanimous appellate court can reverse on the ground that the verdict was against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 389, citing Ohio Constitution, Article IV, Section 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses and the weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 389. When more than one competing interpretation of the evidence is available and the one chosen by the jury is not unbelievable, we do not choose which theory we believe is more credible and impose our view over that of the jury. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶60}** The jury could find the testimony of Appellant and his girlfriend lacked credibility. Instead, the jury could choose to believe the testimony of Nicole and find: Appellant handed her the packet containing fentanyl and instructed her to deliver it to the decedent; she did so and received $40 from the decedent which she passed on to Appellant; when Nicole sampled Appellant's drugs the day before, she noticed that what she thought was heroin was pink in color instead of brown; and she almost overdosed after sampling the drug in Appellant's presence. Additionally, the jury could conclude that Appellant used his own Facebook profile to arrange the drug deal with the decedent through the private messenger service. *See, e.g., State v. Vogt*, 4th Dist. Washington No. 17CA17, 2018-Ohio-4457, ¶ 84, 86.

**{¶61}** Appellant mainly relies on the argument set forth under his sufficiency assignment of error. He concludes that even if we find the evidence was sufficient to

support the causation element, we should find that the jury's conclusion on causation was against the manifest weight of the evidence. However, the direct and circumstantial evidence indicates that the fentanyl was the actual and legal cause of the decedent's death. For specifics, we refer to the discussion supra on the facts and law relevant to causation.

**{¶62}** The strength of those facts and the application of the law set forth supra prevents this court from sitting as the proverbial "thirteenth juror" in this case. As to actual cause, the coroner testified decedent took a lethal dose of fentanyl and would have lived if she had not ingested fentanyl (i.e., she would not have died but for the fentanyl). The surrounding circumstances contributed to the reasonableness of the conclusion that she would not have died without the fentanyl. As to legal cause, the jury did not lose its way in finding the decedent's death was a foreseeable result of the fentanyl sale. *See, e.g., State v. Wells*, 12th Dist. Warren No. CA2016-02-009, 2017-Ohio-420, ¶ 39 (the jury did not lose its way in finding fentanyl was the actual and legal cause of death).

**{¶63}** After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses and the conflicts in the evidence, we cannot find the jury clearly lost its way in finding Appellant caused the decedent's death as a proximate result of committing or attempting to commit felony drug trafficking. There is no indication the jury's verdict resulted in a manifest miscarriage of justice. Accordingly, this assignment of error is overruled.

**{¶64}** The trial court's judgment is affirmed.


Waite, P.J., concurs.

D'Apolito, J., concurs.


Case No. 19 CO 0010

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**